# EXHIBIT 1

FILED: NEW YORK COUNTY CLERK 09/29/2011

NYSCEF DOC. NO. 1

INDEX NO. 652679/2011

RECEIVED NYSCEF: 09/29/2011

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |
|---|---|
| SEALINK FUNDING LIMITED, | Index No. |
| Plaintiffs, | |
| v. | |
| COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; CWALT, INC.; CWABS, INC.; CWHEQ, INC.; COUNTRYWIDE SECURITIES CORPORATION; ANGELO MOZILO; DAVID A. SAMBOL; BANK OF AMERICA CORP.; BAC HOME LOANS SERVICING, L.P., and; NB HOLDINGS CORPORATION, | **SUMMONS** |
| Defendants. | |

**TO THE ABOVE-NAMED DEFENDANTS:**

| | |
|---|---|
| Countrywide Financial Corporation<br>4500 Park Granada<br>Calabasas, California 91302 | Countrywide Home Loans, Inc.<br>4500 Park Granada<br>Calabasas, California 91302 |
| Countrywide Securities Corporation<br>4500 Park Granada<br>Calabasas, California 91302 | CWALT, Inc.<br>4500 Park Granada<br>Calabasas, California 91302 |
| CWABS, Inc.<br>4500 Park Granada<br>Calabasas, California 91302 | CWHEQ, Inc.<br>4500 Park Granada<br>Calabasas, California 91302 |
| Angelo R. Mozilo<br>2816 Ladbrook Way<br>Thousand Oak, California 91361 | David A. Sambol<br>23807 Long Valley Road<br>Hidden Hills, California 91302 |
| Bank of America Corp.<br>1 Bryant Park<br>New York, New York 10036 | BAC Home Loans Servicing, LP<br>1 Bryant Park<br>New York, New York 10036 |

| NB Holdings Corp., c/o<br>The Corporation Trust Company<br>Corporation Trust Center<br>1209 Orange Street, Delaware 19801 | |

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or if the complaint is not served with this summons, to serve notice of appearance, on the plaintiff's attorneys within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for relief demanded herein.

Venue is proper in this Court pursuant to CPLR § 503(a) and Plaintiff has designated New York County as the place of trial.

Dated: New York, New York
      September 29, 2011

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

/s/ Gerald H Silk
Gerald H. Silk
Avi Josefson
Michael D. Blatchley
Ross Shikowitz
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel:    (212) 554-1400
Fax:   (212) 554-1444
jerry@blbglaw.com
avi@blbglaw.com
michaelb@blbglaw.com
ross@blbglaw.com

*Counsel for Plaintiff*

~

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

SEALINK FUNDING LIMITED,

          Plaintiff,

      v.

COUNTRYWIDE FINANCIAL
CORPORATION; COUNTRYWIDE HOME
LOANS, INC.; CWALT, INC.; CWABS,
INC.; CWHEQ, INC.; COUNTRYWIDE
SECURITIES CORPORATION; ANGELO
MOZILO; DAVID A. SAMBOL; BANK OF
AMERICA CORP.; BAC HOME LOANS
SERVICING, L.P., and; NB HOLDINGS
CORPORATION,

          Defendants.

Index No.

**COMPLAINT**

**<u>JURY TRIAL DEMANDED</u>**

~

Plaintiff Sealink Funding Limited ("Sealink" or "Plaintiff"), by its attorneys Bernstein Litowitz Berger & Grossmann LLP, for the Complaint herein against Countrywide Financial Corporation ("Countrywide Financial"), Countrywide Home Loans, Inc. ("Countrywide Home"), Countrywide Securities Corporation ("Countrywide Securities"), CWALT, Inc., CWABS, Inc., CWHEQ, Inc., Angelo Mozilo, David A. Sambol (collectively, "Countrywide" or the "Countrywide Defendants"), Bank of America Corp., BAC Home Loans Servicing, L.P., and NB Holdings Corp. (collectively, the "Bank of America Defendants," and together with the Countrywide Defendants, "Defendants") alleges the following:

## I.    <u>SUMMARY OF THE ACTION</u>

1.      This action concerns a massive fraud perpetrated by Defendant Countrywide Financial and certain of its officers and affiliates against Plaintiff Sealink, and investor in residential mortgage-backed securities ("RMBS") that contained loans purchased, financed, and securitized by Defendants.  The Plaintiff invested in purportedly low-risk Countrywide RMBS (the "Certificates"), in reliance on Defendants' representations that the Certificates were backed by mortgages originated pursuant to specific underwriting guidelines, collateralized by accurately appraised properties, and rated investment-grade (primarily AAA).  In purchasing the Certificates, the Plaintiffs and their investment advisors relied on registration statements, prospectuses, draft prospectus supplements, prospectus supplements, term sheets, and other materials (the "Offering Materials") prepared by and provided to them by the Defendants. These representations by Defendants were recklessly or knowingly false when made, and caused Sealink to believe that the Defendants' RMBS it purchased were safe investments.  In reality, Countrywide was an enterprise driven by only one purpose – to originate and securitize as many mortgage loans as possible into MBS to generate profits for the Countrywide

~

Defendants, without regard to the investors that relied on the critical, false information provided to them with respect to the related Certificates.

2.      Sealink purchased approximately $1.6 billion worth of Defendants' RMBS in 30 offerings between 2005 and 2007 in reliance on the Offering Materials prepared and provided by Defendants.   The Offering Materials contained numerous representations about the purportedly conservative mortgage underwriting standards applied by the mortgage originators, the appraisals of the mortgaged properties, and other facts regarding the collateral underlying the RMBS that were material to Sealink's investment decisions.

3.      However, as Sealink would only later discover, the originators whose loans collateralized the Defendants' RMBS purchased by Sealink did not employ rigid underwriting processes and were among the worst culprits in the subprime lending industry.  These infamous lenders included Countrywide's own subprime mortgage originator, Countrywide Home, as well as other notorious mortgage originators American Home Mortgage Investment Corporation ("American Home"), Decision One Mortgage, Fremont Investment & Loan ("Fremont"), Impac Funding Corp., and AIG subsidiary Wilmington Finance, Inc.    These originators have since folded up their operations, filed for bankruptcy or been shut down by regulators, and are the subject of numerous governmental investigations and private lawsuits alleging misconduct arising out of pervasive illegal and improper mortgage lending practices and other violations of law.

4.      Defendants knew or recklessly disregarded that those lenders were issuing high-risk loans that did not conform to their respective underwriting standards.  Countrywide knew that its own subprime mortgage originator subsidiary, Countrywide Home Loans, was issuing mortgages in flagrant disregard of its stated guidelines.  Countrywide played a ubiquitous role in the mortgage origination and securitization process through Countrywide Home, which

~

originated hundreds of millions of dollars of the loans backing the Countrywide RMBS that Sealink purchased. In the Offering Materials, Countrywide claimed that Countrywide Home—which acted as the sponsor of Sealink's Countrywide RMBS—conducted a *"re-underwriting"* of a random selection of mortgage loans *"to determine whether they were underwritten generally in accordance with the related Originator's underwriting guidelines or reasonable exceptions thereto"*.

5.      Countrywide was driven to purchase and securitize defective loans despite its knowledge that the originators abandoned their guidelines for a sole purpose: to securitize as many mortgage loans as possible into RMBS and generate profits for the Countrywide Defendants without regard to the investors that relied on the critical, but false information provided to them with respect to the related Certificates.

6.      The scope of the Countrywide Defendants' fraud is reflected by, among other things: (i) a securities fraud action brought by the United States Securities and Exchange Commission ("SEC") against three former senior executives of Countrywide Financial, in which the Court denied those Defendants' motion for summary judgment and which then culminated in an historic settlement (the "SEC Action"); (ii) regulatory actions initiated by multiple state attorneys general which resulted in settlements worth over eight billion dollars; (iii) other fraud actions brought against the Countrywide Defendants by investors of mortgage-backed securities ("MBS") and insurers related to the same wrongdoing alleged herein, along with federal securities fraud claims brought against Countrywide for its misstatements to the investing public regarding the company's mortgage loan underwriting standards; and (iv) the enormous number of defaults and foreclosures in the underlying mortgages supporting the RMBS resulting in substantial damages to investors in Countrywide's RMBS.

~

7.     In addition to the misrepresentations in the Offering Materials about the quality of the securitized loans, Defendants also knowingly provided false information to the credit rating agencies in order to secure an investment grade rating for its RMBS.  As a result of these practices, Defendants knew that the ratings assigned to its securitizations did not reflect the true credit quality of the Certificates Sealink purchased.

8.     This misconduct has resulted in astounding rates of default on the loans underlying the Defendants RMBS and massive downgrades of the Certificates, the vast majority of which are now considered "junk."  The underlying loan performance and significant foreclosures have caused Plaintiffs' Certificates to have their credit ratings downgraded.  Today, the Certificates are no longer marketable or salable at or near the prices Sealink paid for them, and Sealink has suffered significant losses as a result of the fraud perpetrated by Defendants.

9.     Sealink seeks compensatory and/or rescissory damages against Defendants for fraud, fraud in the inducement, aiding and abetting fraud, and negligent misrepresentation.

## II.     JURISDICTION AND VENUE

10.     This Court has jurisdiction over each of the non-domiciliary Defendants because each of them transacts business within the State of New York within the meaning of CPLR § 302(a)(1) and each of them committed a tortious act inside the State of New York or outside the State of New York causing injury within the State of New York within the meaning of CPLR §§ 302(a)(2) and 302(a)(3).  The amount in controversy exceeds $150,000.

11.     Venue is proper in this Court pursuant to CPLR § 503(a) and Plaintiff has designated New York County as the place of trial.

4

~

III.   **THE PARTIES**

A.     **Plaintiffs**

12.    Plaintiff Sealink Funding Limited is a company incorporated under the laws of Ireland that was established to receive, hold and manage RMBS purchased by certain special purpose vehicles formerly sponsored by SachsenLB (the "SPVs"), and the claims asserted herein arise from the purchase of those RMBS by the SPVs.  Sealink Funding Limited and the SPVs are hereinafter collectively referred to as "Sealink."

B.     **Countrywide Defendants**

13.    Defendant Countrywide Financial Corporation ("Countrywide Financial" or the "Company") was, at all relevant times, a Delaware corporation with its principal executive offices located at 4500 Park Granada, Calabasas, California.  Countrywide Financial was a holding company which, through its subsidiaries, engaged in mortgage lending, mortgage banking, banking and mortgage warehouse lending, dealing in securities and insurance underwriting throughout the United States.  As discussed below, Countrywide Financial merged with and became a wholly owned subsidiary of Bank of America in 2008.

14.    Defendant Countrywide Home Loans, Inc. ("Countrywide Home"), a direct wholly owned subsidiary of Countrywide Financial, is a New York corporation with its principal place of business in Calabasas, California. Countrywide Home originates and services residential home mortgage loans. Countrywide Home served as the "Seller" of the mortgage loans comprising the security for each of the Certificates purchased by Plaintiffs, meaning that it played a central role in providing the pools of mortgage loans upon which the Certificates were based to the issuing trusts. Countrywide Home was acquired by Bank of America on July 1, 2008, and is now doing business as Bank of America Home Loans, a division of Bank of America.

~

15.     Defendant Countrywide Securities Corporation ("Countrywide Securities"), a wholly owned subsidiary of Countrywide Financial, is a California corporation with its principal place of business in Calabasas, California.  During times relevant to this Complaint, Countrywide Securities had an office in New York, New York.  Countrywide Securities is a registered broker-dealer and was an underwriter of the offerings of MBS.  Countrywide Securities was acquired by Bank of America on July 1, 2008.

16.     Defendant CWALT, Inc. was, at times relevant to this Complaint, a Delaware corporation and a limited-purpose subsidiary of Countrywide Financial.  CWALT's principal executive offices were located at 4500 Park Granada, Calabasas, California.  CWALT served in the role of the "Depositor" and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4) and 17 CFR §230.191.

17.     Defendant CWABS, Inc. was, at times relevant to this Complaint, a Delaware corporation and a limited-purpose subsidiary of Countrywide Financial.  CWABS's principal executive offices were located at 4500 Park Granada, Calabasas, California.  CWABS served in the role of the "Depositor" and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4) and 17 CFR §230.191.

18.     Defendant CWHEQ, Inc. was, at times relevant to this Complaint, a Delaware corporation and a limited-purpose subsidiary of Countrywide Financial.  CWABS's principal executive offices were located at 4500 Park Granada, Calabasas, California.  CWABS served in the role of the "Depositor" and was an "Issuer" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(4) and 17 CFR §230.191.

19.     Defendants CWALT, CWABS, and CWHEQ are collectively referred to herein as the "Depositor Defendants."   The Depositor Defendants were controlled directly by Countrywide Financial, including by the appointment of Countrywide Financial executives as

directors and officers of these entities. Revenues flowing from the issuance and sale of MBS issued by CWALT, and CWABS, and CWHEQ, and the Issuing Trusts were passed through to Countrywide and consolidated into Countrywide Financial's financial statements. Defendant Countrywide Financial, therefore, exercised actual day-to-day control over Defendants CWALT, CWABS, and CWHEQ.

20.    Defendant Angelo R. Mozilo ("Mozilo"), Countrywide's co-founder, was Chairman of Countrywide's Board of Directors starting in March 1999 and Chief Executive Officer ("CEO") starting in February 1998. He was also President of Countrywide Financial from March 2000 through December 2003. Mozilo was a member of Countrywide Financial's Board beginning in 1969, when the Company was founded, and served in other executive roles since then. He left Countrywide on July 1, 2008. In October 2010, Mozilo settled securities fraud claims brought against him by the SEC for $67.5 million in penalties and forfeiture of ill-gotten gains, the largest penalty ever paid by a senior corporate executive in an SEC settlement. At all relevant times, Mozilo directed, authorized, and participated in the Countrywide Defendants' wrongdoing, as alleged herein.

21.    Defendant David Sambol ("Sambol") joined Countrywide Financial in 1985 and was Countrywide Financial's President and Chief Operating Officer ("COO") from September 2006 until Countrywide Financial was acquired by Bank of America in 2008. Sambol was Countrywide Financial's executive managing director for business segment operations and Chief Production Officer from April 2006 until September 2006, and executive managing director and chief of mortgage banking and capital markets from January 2004 until April 2006. Sambol was also Chairman, CEO and a member of the Board of Directors of Countrywide Home beginning in 2007. In October 2010, Sambol settled securities fraud claims brought

against him by the SEC.  At all relevant times, Sambol directed, authorized, and participated in the Countrywide Defendants' wrongdoing, as alleged herein.

22.     The Defendants identified in ¶¶13-21 are hereinafter collectively referred to as the "Countrywide Defendants."

### C.     Bank Of America Defendants

23.     Defendant Bank of America Corp. ("Bank of America") is a successor to Defendant Countrywide.  On July 1, 2008, Countrywide Financial Corporation completed a merger with Red Oak Merger Corporation ("Red Oak"), a wholly owned subsidiary of Bank of America that was created for the sole purpose of facilitating the acquisition of Countrywide, pursuant to an Agreement and Plan of Merger, dated as of January 11, 2008, by and among Bank of America, Red Oak, and Countrywide Financial.  The acquisition was an all-stock transaction.  Bank of America has assumed Countrywide's liabilities, having paid to resolve other litigation arising from misconduct such as predatory lending allegedly committed by Countrywide.  At the time of Bank of America's purchase of Countrywide, a Bank of America spokesperson publicly stated:  "We bought the company and all of its assets and liabilities . . . . We are aware of the claims and potential claims against the company and have factored these into the purchase."  Bank of America is a successor-in-interest to the Countrywide Defendants and is thus vicariously liable for the conduct of the Countrywide Defendants alleged herein.[1]

24.     Defendant BAC Home Loans Servicing, LP is a limited partnership and subsidiary of Bank of America with its principal offices at 4500 Park Granada, Calabasas, CA.

---

[1] The federal court in the SEC Action against Mozilo and Sambol recently noted that "Countrywide's remaining operations and employees have been transferred to Bank of America, and Bank of America ceased using its Countrywide name in April 2009." *Securities and Exchange Commission v. Mozilo*, No. 09-CV-3994, 2010 WL 3656068, at *2 n.2 (C.D. Cal. Sept. 16, 2010).

~

BAC Home Loans Servicing, LP is identified in mortgage contracts and other legal documents as "BAC Home Loans Servicing, LP FNA Countrywide Home Loans Servicing, LP," meaning it was formerly known as Countrywide Home Loans Servicing, LP, the Countrywide subsidiary responsible for servicing Countrywide's mortgage loans after they are originated.

25.     Defendant NB Holdings Corporation is a Delaware corporation.  NB Holdings Corporation is one of the shell entities used to effectuate the Bank of America-Countrywide merger, and is a successor to Defendant Countrywide Home Loans.  On July 3, 2008, Defendant Countrywide Home completed the sale of substantially all of its assets to NB Holdings Corporation, a wholly-owned subsidiary of Bank of America.

26.     The Defendants identified in ¶¶23-25 are hereinafter collectively referred to as the "Bank of America Defendants."

## IV.    FACTS RELEVANT TO SEALINKS'S CLAIMS

### A.    The Defendants' RMBS Purchased By Sealink

27.     RMBS, such as the Defendants RMBS purchased by Sealink, provide the RMBS investor with an interest in income generated by a pool of mortgages.  The actual securities themselves represent a participating interest in an "issuing trust" that holds the mortgage loan pool.  Although the structure and underlying collateral of the mortgages varies among the 37 offerings (and 43 tranches) of RMBS that Sealink purchased, they all function in a similar manner: The cash flows from the borrowers who make interest and principal payments on the individual mortgages comprising the mortgage pool are "passed through" to the certificate holders, like Sealink.  Accordingly, failure by those borrowers to make their mortgage payments directly impacts the returns Sealink earns on its investment.  Moreover, a default resulting in foreclosure may cause the trust to sell the subject property at a loss – a risk that increases when the appraisals utilized in underwriting the loans overstated the value of the property that serves

as collateral for the mortgage.  For these reasons, the proper underwriting of the mortgages underlying the RMBS – including verifying the credit quality of the borrower and the value of the real estate – is essential to ensuring that the RMBS perform according to the representations made to investors like Sealink.

28.    The first step in creating an RMBS is the acquisition by a "depositor" of an inventory of loans from a "sponsor" or "seller," which either originates the loans or acquires the loans from other mortgage originators, in exchange for cash.  The type of loans in the inventory varies, and can include conventional, fixed-rate or adjustable-rate mortgage loans, secured by first liens, junior liens, or a combination of first and junior liens, with various lifetimes to maturity.  The depositor then transfers, or deposits, the acquired pool of loans to an "issuing trust."  Although there can be more than one "sponsor" or "depositor" in a given securitization, in most of the Defendants RMBS purchased by Sealink, affiliates and/or subsidiaries of the Defendants acted as the "depositor" and "sponsor" of the securitization.

29.    The depositor then securitizes the pool of loans in the issuing trust so that the rights to the cash flows from the pool can be sold to investors.  The securitization transactions are structured such that the risk of loss is divided among different levels of investment, or "tranches," with each having a different level of risk and reward.  Typically, losses on the underlying loans—whether due to default, delinquency, or otherwise—are generally applied in reverse order of seniority.  As such, the most senior tranches of pass-through securities are rated by credit rating agencies as the best quality, or "AAA/Aaa."  Junior tranches, which usually obtained lower ratings, ranging from "AA/Aa" to "BB/Ba," are less insulated from risk, but offer greater potential returns in the form of higher rates of interest.  All of the Defendants RMBS purchased by Sealink were among the most senior, risk-averse tranches of the relevant

offerings and were all rated "AAA/Aaa" by at least one credit rating agency at issuance and when purchased by Sealink.

30.     Once the tranches are established, the issuing trust passes the securities back to the depositor, which becomes the issuer of the RMBS.  The depositor then passes the RMBS to the underwriter, which offers and sells the securities to Sealink and other investors in exchange for cash that is passed back to the depositor, less any fees collected by the underwriter. Typically, underwriters collect between 0.2% to 1.5% in discounts, concessions or commissions in serving as an underwriter of an RMBS securitization.  By serving as a sponsor and depositor of the securitizations, the Defendants earned even more.

31.     Because the cash flow from the loans in the collateral pool of a securitization is the source of funds to pay the holders of the RMBS issued by the trust, the credit quality of those securities depends upon the credit quality of the loans in the collateral pool.  The most important information about the credit quality of the loans is contained in the "loan files" that the mortgage originator develops while making the loans.  For residential mortgage loans, each loan file normally contains documents including: the borrower's application for the loan; verification of the borrower's income, assets, and employment; references; credit reports on the borrower; an appraisal of the property that will secure the loan and provide the basis for important measures of credit quality, such as loan-to-value ratios.

32.     The collateral pool of loans for each securitization usually includes thousands of loans.  Instead of each potential investor reviewing thousands of loan files, Defendants, in their roles as a sponsor and underwriter of the securitization, is responsible for gathering, verifying and presenting to potential investors accurate and complete information about the credit quality and characteristics of the loans that are deposited into the trust.  Indeed, the single most important factors for Sealink—and, for any investor—in purchasing Defendants RMBS were:

(1) the ability of the underlying borrowers to repay their mortgages; (2) the ability for the trust to recover its losses in case of default by ensuring the properties were appropriate collateral for the loans and were accurately valued; and (3) the rate of interest received on the RMBS.  The loan files themselves are not provided or available to RMBS investors like Sealink, who must instead rely upon Defendants' representations about the mortgages underlying the RMBS and the process used to select and review those loans.

33.    As noted, all of the Defendants RMBS purchased by Sealink were rated triple-A at issuance, as set forth below:

| # | Offering & Tranche | Original Expenditure | Top Three Originators | Initial | | | Current | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Moody's | Fitch | S&P | Moody's | Fitch | S&P |
| 1 | AHMA 2007-2 A2A | $45,000,000 | American Home Mortgage Investment Corp. | Aaa | | AAA | C | | CC |
| 2 | CWALT 2006-45T1 1A2 | $50,000,000 | Countrywide Home Loans, Inc. | Aaa | AAA | AAA | Ca | D | D |
| 3 | CWALT 2006-HY12 A6 | $50,000,000 | Countrywide Home Loans, Inc. | Aaa | | AAA | C | | D |
| 4 | CWALT 2006-OC2 1A | $95,000,000 | Decision One Mortgage The Mortgage Store Financial, Inc. American Home Mortgage Corp. | Aaa | | AAA | Ca | | D |
| 5 | CWALT 2006-OC4 2A2A | $56,567,000 | Decision One Mortgage GreenPoint Mortgage Corporation Pinnacle Financial Corp. | Aaa | | AAA | Caa2 | | CCC |
| 6 | CWALT 2006-OC6 2A2A | $80,000,000 | Decision One Mortgage Countrywide Home Loans Ohio Savings Bank | Aaa | | AAA | Ca | | D |
| 7 | CWALT 2007-5CB 2A5 | $50,000,000 | Countrywide Home Loans, Inc. | Aaa | AAA | AAA | Ca | D | D |
| 8 | CWALT 2007-HY7C A3 | $30,000,000 | Countrywide Home Loans, Inc. | Aaa | | AAA | C | | CC |
| 9 | CWALT 2007-OA7 A2A | $50,000,000 | Countrywide Home Loans | Aaa | | AAA | C | | CCC |
| 10 | CWHEL 2006-D 2A | $80,000,000 | Countrywide Bank, N.A. Countrywide Home Loans | Aaa | | AAA | Ca/*- | | D |
| 11 | CWL 2005-AB4 2A3 | $45,000,000 | Countrywide Home Loans | Aaa | | AAA | Caa3 | | CCC |
| 12 | CWL 2006-11 3AV2 | $50,000,000 | Countrywide Home Loans, Inc. | Aaa | | AAA | Caa3 | | CCC |
| 13 | CWL 2006-18 2A2 | $80,000,000 | Countrywide Home Loans, Inc. | Aaa | | AAA | Caa2 | | CCC |
| 14 | CWL 2006-3 2A2 | $60,000,000 | Countrywide Home Loans, Inc. | Aaa | | AAA | B2 | | BBB+/ *- |

| # | Offering & Tranche | Original Expenditure | Top Three Originators | Initial | | | Current | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Moody's | Fitch | S&P | Moody's | Fitch | S&P |
| 15 | CWL 2006-5 2A2 | $25,000,000 | Countrywide Home Loans, Inc. | Aaa | | AAA | B2 | | B- |
| 16 | CWL 2006-8 2A3 | $55,000,000 | Countrywide Home Loans, Inc. | Aaa | | AAA | Caa3 | | B-/*- |
| 17 | CWL 2006-IM1 A2 | $30,000,000 | Impac Funding Corporation | Aaa | | AAA | Ca | | CCC |
| 18 | CWL 2007-1 2A4 | $30,000,000 | Countrywide Home Loans, Inc. | Aaa | | AAA | C | | CCC |
| 19 | CWL 2007-2 2A4 | $25,800,000 | Countrywide Home Loans, Inc. | Aaa | | AAA | C | | CCC |
| 20 | CWL 2007-3 2A3 | $38,000,000 | Countrywide Home Loans, Inc. | Aaa | | AAA | Ca | | B-/*- |
| 21 | CWL 2007-6 2A3 | $60,000,000 | Countrywide Home Loans, Inc. | Aaa | | AAA | Ca | | CCC |
| 22 | CWL 2007-7 2A3 | $50,000,000 | Countrywide Home Loans, Inc. | Aaa | | AAA | Ca | | B-/*- |
| 23 | CWL 2007-BC1 2A4 | $32,583,000 | Wilmington Finance, Inc. Quick Loan Funding Corp. CIT Communications | Aaa | | AAA | C | | CCC |
| 24 | CWL 2007-BC3 2A3 | $48,914,000 | Decision One Mortgage Wilmington Finance, Inc. CIT Group/Consumer Finance, Inc. | Aaa | | AAA | C | | CCC |
| 25 | GSCC 2006-1 A1 | $73,877,000 | American Home Mortgage Corp. Countrywide Home Loans First National Bank of Nevada | Aaa | AAA | AAA | Caa3 | C | CCC |
| 26 | IMM 2005-7 A1 | $75,000,000 | Impac Funding Corporation Decision One Mortgage | Aaa | | AAA | Caa2 | | CC |
| 27 | IMSA 2006-3 A2 | $80,000,000 | Impac Funding Corporation | Aaa | | AAA | Caa3 | | D |
| 28 | IMSA 2007-1 A2 | $58,000,000 | Impac Funding Corporation | Aaa | | AAA | Caa3/ * | | CCC |
| 29 | IMSA 2007-1 AM | $32,900,00 | Impac Funding Corporation | Aaa | | AAA | Caa3/ * | | CCC |
| 30 | JPMAC 2006-FRE2 A3 | $32,900,000 | Impac Funding Corporation | Aaa· | | AAA | C | | D |
| 31 | MSHEL 2007-1 A4 | $50,000,000 | Accredited Home Lenders Wilmington Finance, Inc. Fremont Investment & Loan | Aaa | | AAA | Ca | | CCC |

**B.    Defendants' Activities In The Subprime Mortgage Arena**

34.    Defendants' activities as a buyer, financer and securitizer of residential mortgage loans have been the focus of numerous government investigations and prosecutions as well as private investor lawsuits.  At the height of the subprime bubble, Defendants' executives became concerned about competition in the RMBS arena from their rivals.  In response, Defendants

13

aggressively pursued opportunities to profit from the booming subprime mortgage securitization industry.

35. Defendants' activities were integral to the growth and proliferation of high-risk mortgages that contributed to the financial crisis. Mortgage originators generated profits primarily through the sale of their loans to investment banks like Defendants, and the originators were therefore driven to originate and sell as many loans as possible. Increased demand for mortgages by banks like Defendants, which, as noted above, were competing to sell mortgage-backed products, led to increased volume in mortgage originations. That increased volume, in turn, led to a decrease in the gain-on-sale margins that mortgage originators received from selling pools of loans. As a result, originators began to borrow money from the same large banks that were buying their mortgages in order to fund the origination of even more mortgages.

36. One of the principal ways originators obtained such capital was by establishing a warehouse line of credit with an investment bank. The line of credit, in turn, would be secured by the very mortgage loans that the investment bank would purchase for securitization. Investment banks, such as Defendants, earned fees and interest income on those warehouse lines of credit.

### C. Defendants' Role Was To Ensure The Quality Of The Loans Backing The RMBS

37. Defendants and the mortgage originators utilized two methods to securitize mortgages into RMBS for sale to investors. Specifically, the originators aggregated the loans into pools and would either (1) deposit them into a trust that would issue RMBS backed by the loans (referred to herein as an "originator securitization"), or (2) sell the loan pools to an investment bank, and the investment bank would then deposit the securities into a trust that would issue securities backed by the loans ("principal securitization"). Under the first

14

approach, Defendants profited by the fees they received by serving as an underwriter of the securities issued by the originator. Under the second approach, referred to herein as a "principal securitization" because the investment bank is securitizing the loans on its own behalf, Defendants profited off of the difference in the price it paid for the loan pools it purchased from the originator and that which it received from the sale of those loans as RMBS.

38.    Most of the RMBS purchased by Sealink at issue in this action were securitized through principal securitization, whereby Defendants would first purchase loan pools originated by third-party originators and/or loan sellers and then sell those loans into the RMBS trust as the sponsor of a mortgage securitization. Some investors prefer principal securitizations to originator securitizations because the involvement of a sophisticated investment bank throughout the securitization process indicates a higher degree of oversight and due diligence on the mortgages being selected for inclusion in the RMBS.

39.    Prior to purchasing loans from an originator in a principal securitization, Defendants would perform due diligence on the mortgage loan pools by examining three areas—credit, compliance and valuation. First, credit diligence examined a sampling of the individual loans in a given loan pool to assess their quality and compliance with the underwriting guidelines of the originator. An originator's underwriting guidelines are a critical tool for investors to evaluate the risk of default on the loans that serve as collateral for RMBS. Prudent lending standards—as articulated in an originator's underwriting guidelines—are addressed in numerous federal guidance statements requiring that federally-regulated institutions adopt well-defined underwriting parameters such as acceptable loan-to-value ratios,

debt-to-income ratios, and minimum acceptable credit scores.[2] Those federal standards have been adopted by the subprime industry as a whole through substantially similar guidance published by the Conference of State Bank Supervisors and the American Association of Residential Mortgage Regulators. These standards are intended not only to protect borrowers to ensure that they can repay their loans, but also to ensure the safety and soundness of individual lending institutions and the financial system as a whole. Second, compliance diligence focused on whether the loans were originated in compliance with state, federal and local laws, including predatory lending and truth-in-lending statutes. Third, valuation diligence checked the accuracy of the originator's reported property valuations of the collateral backing the loans. In a principal securitization, this due diligence provides comfort to investors that Morgan Stanley has ensured that only mortgages that conform to the requirements of the RMBS at issue are being securitized.

40. In truth, Defendants routinely ignored the pervasive defects that their due diligence identified in the loans they had purchased for securitization. Defendants deliberately concealed these defects from Sealink and other investors in order to increase their own profits, preserve their ongoing business relationships with the RMBS originators, and move risk from their own balance sheet onto investors. Instead, as discussed in further detail below, Defendants used their asymmetrical informational advantage to reap illicit profits.

---

[2] *See, e.g.*, 12 C.F.R. Part 34, subpart D (Office of the Comptroller of Currency standards); 12 C.F.R. Part 208, subpart C (Board of Governors of the Federal Reserve standards); 12 C.F.R. Part 365 (Federal Deposit Insurance Corporation standards); 12 C.F.R. 560.100 and 12 C.F.R. 560.101 (Office of Thrift Supervision standards); and 12 CFR 701.21 (National Credit Union Administration standards).

### D.    Factors Impacting The Quality Of The Defendants RMBS

41.    Federal regulators have long recognized the importance of sound lending and have for years issued guidance on subprime mortgage products to ensure that borrowers are able to repay their loans.  For example, the 1993 Interagency Guidelines for Real Estate Lending, issued jointly by the Board of Governors of the Federal Reserve System (Morgan Stanley's primary federal regulator), the Office of the Comptroller of the Treasury, the Federal Depository Insurance Commission, the Office of Thrift Supervision, and the National Credit Union Administration, provided that prudently underwritten real estate loans (subprime or otherwise) "should reflect all relevant credit factors, including . . . the capacity of the borrower, or income from the underlying property, to adequately service the debt."  Federal regulators responded to the growth of newer subprime products with enhanced guidance in 1999, warning that if risks associated with subprime lending were "not properly controlled, the agencies consider subprime lending a high-risk activity that is unsafe and unsound."

42.    The 1999 guidance recognized the critical role that banks such as Defendants, which comprised the primary market for the sale of subprime loans, played in dictating and enforcing underwriting standards for subprime mortgage lending:

> Institutions should not accept loans from originators that do not meet their underwriting criteria, and should regularly review loans offered to ensure that loans purchased continue to meet those criteria. Deterioration in the quality of purchased loans or in the portfolio's actual performance versus expectations requires a thorough reevaluation of the lenders or dealers who originated or sold the loans, as well as a reevaluation of the institution's criteria for underwriting loans and selecting dealers and lenders. Any such deterioration may also highlight the need to modify or terminate the correspondent relationship or make adjustments to underwriting and dealer/lender selection criteria.

43.    The guidance also required that "institutions . . . perform an ongoing analysis of subprime loans," "have information systems in place to segment and stratify their portfolio (*e.g.*,

~

by originator, loan-to-value, debt-to-income ratios, credit scores) and produce reports for management to evaluate the performance of subprime loans," determine "whether performance meets expectations," and "consider the source and characteristics of loans that do not meet expectations and make changes in their underwriting policies and loan administration procedures to restore performance to acceptable levels."

44.     Indeed, the fundamental basis upon which RMBS are valued is the ability of the borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral. Thus, proper loan underwriting is critical to assessing the borrowers' ability to repay the loans, and a necessary consideration when purchasing and pooling loans. If the loans pooled in the RMBS suffer defaults and delinquencies in excess of the assumptions built into the certificate payment structure, RMBS investors suffer losses because of the diminished cash flow into the RMBS.

45.     Likewise, independent and accurate appraisals of the collateralized real estate are essential to ensure that the mortgage or home equity loan can be satisfied in the event of a default and foreclosure on a particular property. An accurate appraisal is necessary to determine the likely price at which the foreclosed property can be sold and, thus, the amount of money available to pass through to certificate holders.

46.     An accurate appraisal is also critical to calculating the loan-to-value ("LTV") ratio, which is a financial metric commonly used to evaluate the price and risk of RMBS. The LTV ratio expresses the amount of mortgage or loan as a percentage of the appraised value of the collateral property. For example, if a borrower seeks to borrow \$90,000 to purchase a home worth \$100,000, the LTV ratio is equal to \$90,000 divided by \$100,000, or 90%. If, however, the appraised value of the house has been artificially inflated to \$100,000 from \$90,000, the real LTV ratio would be 100% (\$90,000 divided by \$90,000). The term combined loan-to-value

~

ratio ("CLTV") applies to the situation in which more than one loan is secured by a particular property. For example, a property valued at $100,000 with a single mortgage of $50,000 has an LTV of 50%. A similar property with a value of $100,000 with a first mortgage of $50,000 and a second lien mortgage of $25,000 has an aggregate mortgage balance of $75,000, and a CLTV of 75%.

47. From an investor's perspective, a high LTV or CLTV ratio represents a greater risk of default on the loan. First, borrowers with a small equity position in the underlying property have "less to lose" in the event of a default. Second, even a slight drop in housing prices might cause a loan with a high LTV ratio to exceed the value of the underlying collateral, which might cause the borrower to default and would prevent the issuing trust from recouping its expected return in the case of foreclosure and subsequent sale of the property.

48. Consequently, the LTV ratios of the loans underlying the RMBS are important to investors' assessment of the value of such RMBS. Prospectuses typically provide information regarding the LTV ratios, and even guarantee certain LTV ratio limits for the loans that will support the RMBS. Each of the prospectus supplements expressly stated, in sum or substance, that none of the mortgage loans have loan-to-value ratios at origination, or with respect to second-lien mortgages, combined loan-to-value ratios at origination, in excess of 100%. As discussed below, this representation was false because a substantial portion of the loans purchased and securitized by Defendants had LTVs and CLTVs that exceeded 100% as calculated under independent property valuations obtained by Defendants.

49. Another important metric when considering a borrower's ability to repay a loan is a borrower's debt-to-income ratio, or DTI, which reflects the increased risk that borrowers whose debt is relatively high compared to their income will default on their loans. While a borrower's current DTI is good measure of his or her capacity to repay a fixed rate mortgage,

other loan products, such as adjustable rate mortgages ("ARMs"), have initial "teaser" rates that reset at much higher index rates after a certain period. A "fully indexed rate" accounts for this interest rate reset, and represents the interest rate over the life of the loan, calculated by adding the index rate at origination and the margin that a lender adds to the index rate after the initial "teaser" period. For example, if the current index rate is 2.5%, and if the margin on a particular loan is 3%, the fully indexed rate on that loan is 5.5%. Because the fully indexed rate accounts for the current value of the interest rate index used by an ARM, it is a better measure of a borrower's ability to repay the loan.

50.     In 2006, the interagency regulators, responding to the explosive growth of non-traditional mortgage products, provided revised guidance explicitly addressing how institutions should calculate a borrower's DTI. Specifically, the underwriting guidelines state that "[w]hen an institution offers nontraditional mortgage loan products, underwriting standards should address the effect of a substantial payment increase on the borrower's capacity to repay when loan amortization begins." Moreover, according to the guidance:

> *For all nontraditional mortgage loan products, an institution's analysis of a borrower's repayment capacity should include an evaluation of their ability to repay the debt by final maturity at the fully indexed rate, assuming a fully amortizing repayment schedule.* In addition, for products that permit negative amortization, the repayment analysis should be based upon the initial loan amount plus any balance increase that may accrue from the negative amortization provision.[3]

51.     The federal guidance thus served to provide assurance to investors that investments in instruments backed by subprime mortgages could be safe and conservative products so long as the underlying loans were properly underwritten and scrutinized. Indeed, the federal guidance made clear that heightened attention to and rigorous compliance with strict

---

[3] All emphasis added unless otherwise indicated.

underwriting standards was critical for institutions engaged in subprime lending due to the unique risks posed by that borrower population.  As regulators made clear, in the context of RMBS such as those purchased by Sealink here, representations concerning underwriting guidelines, appraisals, LTVs and DTIs were paramount.

## V.    THE OFFERING MATERIALS MISREPRESENTED THE UNDERWRITING AND QUALITY OF THE LOANS BACKING THE DEFENDANTS RMBS

52.    Contrary to the statements in the Offering Materials and other communications by Defendants used to solicit Sealink's investment in the RMBS, the originators whose loans served as collateral for Sealink's investments routinely and egregiously violated their stated underwriting guidelines.  As a result, the mortgages they originated and sold to Defendants for securitization presented a materially higher risk to investors than represented by Defendants in the Offering Materials.

53.    For example, the CWL 2006-18 prospectus supplement described Countrywide's Home Loans underwriting standards, in relevant part, as follows:

> Prior to the funding of any credit-blemished mortgage loan, Countrywide Home Loans underwrites the related mortgage loan in accordance with the underwriting standards established by Countrywide Home Loans. In general, the mortgage loans are underwritten centrally by a specialized group of underwriters who are familiar with the unique characteristics of credit-blemished mortgage loans. In general, Countrywide Home Loans does not purchase any credit-blemished mortgage loan that it has not itself underwritten.
>
> *Countrywide Home Loans' underwriting standards are primarily intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan and the borrower's credit standing and repayment ability. On a case by case basis, Countrywide Home Loans may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception.*

54.     Similarly, the CWALT 2006-OC6 prospectus supplement described Decision One

Mortgage Company LLC's underwriting standards, in relevant part, as follows:

> *The mortgage loans will have been originated in accordance with*
> *the Decision One Underwriting Guidelines. On a case by case*
> *basis, exceptions to the Decision One Underwriting Guidelines*
> *are made where compensating factors exist.*

55.     Further, like the other originators whose loans backed the RMBS purchased by

Sealink, the Offering Materials described the documentation that prospective borrowers

purportedly produced or were required to produce in order to properly obtain a mortgage loan.

For example, the CWALT 2006-OC6 prospectus supplement stated, in relevant part, as follows:

> *In general, a prospective borrower applying for a loan is required*
> *to fill out a detailed application designed to provide to the*
> *underwriting officer pertinent credit information.* As part of the
> description of the borrower's financial condition, the borrower
> generally is required to provide a current list of assets and
> liabilities and a statement of income and expenses, as well as an
> authorization to apply for a credit report which summarizes the
> borrower's credit history with local merchants and lenders and any
> record of bankruptcy. In most cases, an employment verification is
> obtained from an independent source (typically the borrower's
> employer) which verification reports, among other things, the
> length of employment with that organization and the borrower's
> current salary. If a prospective borrower is self-employed, the
> borrower may be required to submit copies of signed tax returns.
> The borrower may also be required to authorize verification of
> deposits at financial institutions where the borrower has demand or
> savings accounts.

56.     The Offering Materials also provided information regarding the appraisal

standards and practices employed by the Defendants.   For example, the CWL 2007-BC1

prospectus supplement described Wilmington Finance Inc.'s appraisal practices as follows:

> The property that is to secure a mortgage loan generally is
> appraised by a qualified independent appraiser.  These appraisers
> inspect and appraise the subject property and verify that the
> property is in acceptable condition.  Following each appraisal, the
> appraiser prepares a report which typically includes a market value
> analysis based on recent sales of comparable homes in the area

and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. *Generally, all appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac. The underwriting guidelines generally require a review of the appraisal by a qualified employee of the Originator or by an appraiser retained by the Originator.*

57.   Finally, the Offering Materials provided information regarding the re-underwriting practices of mortgage loans employed by Countrywide Home Loans.  For example, the CWL 2007-BC1 prospectus supplement. State in relevant part, as follows:

> *Countrywide Home Loans reviewed the Mortgage Loans to determine whether they were underwritten generally in accordance with the related Originator's underwriting guidelines or reasonable exceptions thereto.* In the course of such review, Countrywide Home Loans assigned to each Mortgage Loan a credit grade category which the Countrywide Home Loans employs in its own underwriting guidelines for credit blemished mortgage loans to grade the likelihood that the mortgagor will satisfy the repayment conditions of the mortgage loans. In general, Countrywide Home Loans assigns a credit grade category by evaluating a borrower's consumer credit history, mortgage history, time since bankruptcy, and time since foreclosure or notice of default.

58.   These statements of material fact, and materially similar statements appearing in all of the Defendants' RMBS Offering Materials, were false and misleading when made because the originators discussed below failed to adhere to their established underwriting standards. Indeed, the reckless practices of the mortgage originators whose loans backed the Defendants RMBS rendered numerous statements concerning the originator's guidelines, the LTV ratios, property appraisal values, and the credit ratings assigned to the RMBS materially false and misleading.  As such, the riskiness of the loans underlying the RMBS purchased by Sealink, and thus the true risk profile of the RMBS was materially misrepresented.  Through Defendants' intimate knowledge of the originators' underwriting practices gleaned through its own

subsidiary, which provided a majority of the loans backing the RMBS, Defendants knew of these

misrepresentations, and concealed them from Sealink.

**A.     Countrywide Home Violated Its Underwriting Guidelines**

59.     Countrywide was steeped in every aspect of the securitization process, including

the origination of the mortgage loans underlying the RMBS through Defendant Countrywide

Home.  The fact that Countrywide itself controlled this entity provides compelling evidence that

Countrywide *knew* that the loans backing the Countrywide RMBS failed to meet the established

underwriting guidelines represented in the relevant Offering Materials set forth below.

60.     Defendant Countrywide Home, a direct wholly-owned subsidiary of Countrywide

Financial, originated a substantial percentage of the loans in several of the Defendants RMBS

purchased by Sealink.  The Offering Materials for such RMBS contained false and misleading

statements of material fact regarding Countrywide's underwriting standards and practices.  For

example, the prospectus supplement for the CWL 2006-3 RMBS represented Countrywide's

underwriting guidelines, in relevant part, as follows:

> Countrywide Home Loans' underwriting standards are primarily
> intended to evaluate the value and adequacy of the mortgaged
> property as collateral for the proposed mortgage loan and the
> borrower's credit standing and repayment ability. On a case by
> case basis, Countrywide Home Loans may determine that, based
> upon compensating factors, a prospective borrower not strictly
> qualifying under the underwriting risk category guidelines
> described    below    warrants    an    underwriting    exception.
> Compensating factors may include low loan-to-value ratio, low
> debt-to-income ratio, stable employment, time in the same
> residence or other factors. It is expected that a significant number
> of the Mortgage Loans will have been originated based on these
> types of underwriting exceptions.
>
> Each prospective borrower completes an application which
> includes information with respect to the applicant's assets,
> liabilities, income and employment history, as well as certain other
> personal information. Countrywide Home Loans requires an

independent credit bureau report on the credit history of each applicant in order to evaluate the applicant's prior willingness and/or ability to repay. The report typically contains information relating to credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments, among other matters.

*       *       *

Countrywide Home Loans underwrites or originates credit-blemished mortgage loans pursuant to alternative sets of underwriting criteria under its Full Documentation Loan Program (the "Full Doc Program"), and Stated Income Loan Program (the "Stated Income Program"). *Under each of the underwriting programs, Countrywide Home Loans verifies the loan applicant's sources and amounts of income (except under the Stated Income Program where the amount of income is not verified), calculates the amount of income from all sources indicated on the loan application, reviews the credit history of the applicant, calculates the debt-to-income ratio to determine the applicant's ability to repay the loan, and reviews the appraisal of the mortgaged property for compliance with Countrywide Home Loans' underwriting standards.*

61.    The Offering Materials also made false and misleading representations of material fact concerning Countrywide Home's appraisal practices for mortgage loans backing the Certificates. For example, the CWL 2006-3 prospectus supplement stated, in relevant part, that:

Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations *and require an independent appraisal of the mortgaged property prepared on a Uniform Residential Appraisal Report (Form 1004) or other appraisal form as applicable to the specific mortgaged property type. Each appraisal includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home and generally is required to have been made not earlier than 180 days prior to the date of origination of the mortgage loan.* Every independent appraisal is reviewed by a representative of Countrywide Home Loans before the loan is funded, and an additional review appraisal is generally performed in connection with appraisals not provided by Landsafe Appraisals, Inc., a wholly owned subsidiary of Countrywide Home Loans. In most cases, properties that are not at least in average condition (including properties requiring major

deferred maintenance) are not acceptable as collateral for a credit-blemished loan.

62.    In addition, Countrywide represented in the prospectus supplements for the RMBS that Countrywide Home performed a re-underwriting of the mortgage loans purchased by the originators to ensure conformity with prudent underwriting standards, including by performing a full re-underwriting of a random sampling of the loans it purchased for securitization in order to ensure the quality and soundness of those loans.

63.    For example, the CWL 2007-BC1 prospectus supplement state, in relevant part, as follows:

> *Re-Underwriting of Mortgage Loans by Countrywide Home Loans*[.]  **Countrywide Home Loans reviewed the Mortgage Loans to determine whether they were underwritten generally in accordance with the related Originator's underwriting guidelines or reasonable exceptions thereto.** In the course of such review, Countrywide Home Loans assigned to each Mortgage Loan a credit grade category which the Countrywide Home Loans employs in its own underwriting guidelines for credit blemished mortgage loans to grade the likelihood that the mortgagor will satisfy the repayment conditions of the mortgage loans. In general, Countrywide Home Loans assigns a credit grade category by evaluating a borrower's consumer credit history, mortgage history, time since bankruptcy, and time since foreclosure or notice of default.

64.    These statements were false and misleading when made in that they misrepresented that Countrywide: (i) systematically failed to follow its stated underwriting standards; (ii) allowed pervasive exceptions to its stated underwriting standards in the absence of compensating factors; (iii) disregarded credit quality in favor of generating increased loan volume; (iv) violated its stated appraisal standards and in many instances materially inflated the values of the underlying mortgage properties in the loan origination and underwriting process.

~

## B.   American Home Violated Its Underwriting Guidelines

65.   American Home originated a substantial portion of the loans for the GSCC 2006-1 and AHMA 2007-2 RMBS purchased by Sealink.   The Offering Materials for such RMBS contained false and misleading statements of material fact regarding American Home's underwriting standards and practices.   For example, the prospectus supplement for the AHMA 2007-2 RMBS described American Home's underwriting guidelines, in relevant part, as follows:

> The mortgage loans have been purchased or originated, underwritten and documented in accordance with the guidelines of Fannie Mae, Freddie Mac, the Federal Housing Administration (FHA), the Department of Veterans Affairs (VA), the US Department of Agriculture Guaranteed Rural Housing Program (GRH), Ginnie Mae, the underwriting guidelines of specific private investors, and the nonconforming or Alt-A underwriting guidelines established by the Originator. Conforming conventional loans must generally be approved by the Desktop Underwriter and Loan Prospector automated underwriting systems of Fannie Mae and Freddie Mac. FHA and VA loans are generally approved by these same automated underwriting systems.
>
> *                *                *
>
> ***The Originator's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt.*** Because each loan is different, the Originator expects and encourages underwriters to use professional judgment based on their experience in making a lending decision.
>
> The Originator underwrites a borrower's creditworthiness based solely on information that the Originator believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.
>
> *                *                *
>
> The Originator realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages "common sense" underwriting. Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation. ***Therefore, each case is weighed***

> *individually on its own merits and exceptions to the Originator's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception.*

66.     The Offering Materials also made false and misleading representations of material fact concerning American Home's appraisal practices for mortgage loans backing the Certificates.  For example, the same prospectus supplement stated, in relevant part, that:

> *Every American Home mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation.* The appraisers perform on site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties, a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment. In addition, each appraisal is reviewed for accuracy and consistency by an American Home underwriter or a mortgage insurance company contract underwriter.

67.     The above statements of material fact were false and misleading when they were made because they misrepresented that American Home: (i) systematically failed to follow its own underwriting guidelines; (ii) allowed pervasive exceptions to its underwriting standards in the absence of qualifying compensating factors; (iii) disregarded credit quality to meet the demand for loans to securitize into RMBS; and (iv) violated its stated appraisal standards, and, in many instances, materially inflated the values of the underlying mortgaged properties in the loan origination and underwriting process.

**C.     Fremont Violated Its Underwriting Guidelines**

68.     Fremont originated a substantial percentage of the loans for several of the RMBS purchased by Sealink.  The Offering Materials for such RMBS contained false and misleading statements of material fact regarding Fremont's underwriting standards and practices.  For

~

example, the prospectus supplement for the JPMAC 2006-FRE2 RMBS described Fremont's

underwriting guidelines, in relevant part, as follows:

> Mortgage loans are underwritten in accordance with Fremont's current underwriting programs, referred to as the Scored Programs ("Scored Programs"), subject to various exceptions as described in this section. Fremont began originating mortgage loans pursuant to Scored Programs in 2001. *Fremont's underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.*
>
> *       *       *
>
> All of the mortgage loans were underwritten by Fremont's underwriters having the appropriate approval authority. Each underwriter is granted a level of authority commensurate with their proven judgment, experience and credit skills. *On a case by case basis, Fremont may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below is nonetheless qualified to receive a loan, i.e., an underwriting exception. Compensating factors may include, but are not limited to, low loan-to -value ratio, low debt to income ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address.* It is expected that a substantial portion of the mortgage loans may represent such underwriting exceptions.
>
> *       *       *
>
> *Fremont's underwriting guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require an appraisal of the mortgaged property, and if appropriate, a review appraisal. Generally, initial appraisals are provided by qualified independent appraisers licensed in their respective states.* Review appraisals may only be provided by appraisers approved by Fremont. In some cases, Fremont relies on a statistical appraisal methodology provided by a third-party. Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with Fremont. Each uniform residential appraisal report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. The review appraisal may be a

desk review, field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises.

*       *       *

*Fremont conducts a number of quality control procedures, including a post-funding review as well as a full reunderwriting of a random selection of loans to assure asset quality.* Under the funding review, all loans are reviewed to verify credit grading, documentation compliance and data accuracy. Under the asset quality procedure, a random selection of each month's originations is reviewed. *The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision.* A report detailing review findings and level of error is sent monthly to each loan production office for response. *The review findings and branch responses are then reviewed by Fremont's senior management.* Adverse findings are tracked monthly. This review procedure allows Fremont to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training.

69.     The above statements of material fact were false and misleading when made because, in truth, Fremont: (i) abandoned its underwriting guidelines, verification procedures and quality control standards in order to increase loan originations; (ii) allowed pervasive exceptions to its underwriting guidelines in the absence of existing compensating factors; (iii) consistently failed to properly document prospective borrowers' ability to repay their mortgage loans; and (iv) systematically disregarded its stated appraisal standards and in many instances materially inflated the values of the underlying mortgaged properties in the loan origination and underwriting process.

**D.     Wilmington Finance, Inc. Abandoned Its Underwriting Guidelines**

70.     Wilmington Finance, Inc. ("Wilmington"), is a wholly-owned subsidiary of American International Group, Inc. Wilmington originated mortgage loans for the CWL 2007-BC1, CWL 2007-BC3, and MSHEL 2007-1 RMBS purchased by Sealink. The Offering Materials for such RMBS contained false and misleading statements of material fact regarding

30

Fremont's underwriting standards and practices. For example, the prospectus supplement for the CWL 2007-BC1 RMBS described Wilmington's underwriting guidelines, in relevant part, as follows:

> Generally, under the underwriting guidelines, the Originator reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service-to-income ratio to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed and reviews the property. *The underwriting guidelines generally require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations and requires the Originator's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal and a review of the appraisal currently supports the outstanding loan balance.*
>
> The underwriting guidelines of the Originators are more flexible than the standards generally acceptable to Freddie Mac and Fannie Mae with regard to the borrower's credit standing and repayment ability. *While more flexible, the underwriting guidelines still place significant reliance on a borrower's ability to repay;* however the Originator generally may require lower loan-to-value ratios than for loans underwritten to Freddie Mac and Fannie Mae standards. Borrowers who qualify generally have payment histories and debt-to-income ratios which would not satisfy Freddie Mac and Fannie Mae underwriting guidelines and may have a record of major derogatory credit items such as outstanding judgments or prior bankruptcies. *On a case-by-case basis, exceptions to the underwriting guidelines are made where compensating factors exist. Compensating factors usually include low loan-to-value ratio, low debt-to-income ratio, stable employment, length of time in the same residence, cash reserves and/or reduction in monthly debt service.* It is expected that a significant portion of the Mortgage Loans in the mortgage pool will represent these exceptions.

71.   The Offering Materials also made false and misleading representations of material fact concerning Wilmington's appraisal practices for mortgage loans backing the Certificates. For example, the same prospectus supplement stated, in relevant part, that:

The property that is to secure a mortgage loan generally is appraised by a qualified independent appraiser. These appraisers inspect and appraise the subject property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which typically includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. Generally, all appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac. The underwriting guidelines generally require a review of the appraisal by a qualified employee of the Originator or by an appraiser retained by the Originator.

72.     The above statements of material fact were false and misleading when made because, in truth, Wilmington: (i) abandoned its underwriting guidelines, verification procedures and quality control standards in order to increase loan originations; (ii) allowed pervasive exceptions to its underwriting guidelines in the absence of existing compensating factors; (iii) consistently failed to properly document prospective borrowers' ability to repay their mortgage loans; and (iv) systematically disregarded its stated appraisal standards and in many instances materially inflated the values of the underlying mortgaged properties in the loan origination and underwriting process.

### E.     Impac Funding Corp. Abandoned Its Underwriting Guidelines

73.     Impac Funding Corporation ("Impac") originated a substantial percentage of the loans for the CWL 2006-IM1, IMM 2005-7, IMSA 2006-3, and IMSA 2007-1 RMBS purchased by Sealink. The Offering Materials for such RMBS contained false and misleading statements of material fact regarding Impac's underwriting standards and practices.  For example, the prospectus supplement for the IMSA 2006-3 RMBS described Impac's underwriting guidelines, in relevant part, as follows:

~

Approximately 71.49% of the sample mortgage loans were underwritten pursuant to, or in accordance with, the standards of the Originators Progressive Series Program which is described below.

\*     \*     \*

The Progressive Series Program General.   The underwriting guidelines utilized in the Progressive Series Program, as developed by the Originator, are intended to assess the borrower's ability and willingness to repay the mortgage loan obligation and to assess the adequacy of the mortgaged property as collateral for the mortgage loan. The Progressive Series Program is designed to meet the needs of borrowers with excellent credit, as well as those whose credit has been adversely affected. . . .   The philosophy of the Progressive Series Program is that no single borrower characteristic should automatically determine whether an application for a mortgage loan should be approved or disapproved. Lending decisions are based on a risk analysis assessment after the review of the entire mortgage loan file. Each mortgage loan is individually underwritten with emphasis placed on the overall quality of the mortgage loan.

\*     \*     \*

Each prospective borrower completes a mortgage loan application which includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information. The Originator requires a credit report on each applicant from a credit reporting company. The report typically contains information relating to credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions or judgments.

\*     \*     \*

*Variations.* **The Originator uses the following parameters as guidelines only. On a case-by-case basis, the Originator may determine that the prospective mortgagor warrants an exception outside the standard program guidelines.** An exception may be allowed if the loan application reflects certain compensating factors, including instances where the prospective mortgagor:

• has demonstrated an ability to save and devote a greater portion of income to basic housing needs;

• may have a potential for increased earnings and advancement because of education or special job training, even if the prospective mortgagor has just entered the job market;

• has demonstrated an ability to maintain a debt free position;

• may have short term income that is verifiable but could not be counted as stable income because it does not meet the remaining term requirements; and

• has net worth substantial enough to suggest that repayment of the loan is within the prospective mortgagor's ability.

74.    The Offering Materials also made false and misleading representations of material fact concerning Impac's appraisal practices for mortgage loans backing the Certificates.   For example, the same prospectus supplement stated, in relevant part, that:

> *Appraisals.* The Originator does not publish an approved appraiser list for the conduit seller. Each conduit seller maintains its own list of appraisers, provided that each appraiser must:
>
> • be a state licensed or certified appraiser;
>
> • *meet the independent appraiser requirements for staff appraisers, or, if appropriate, be on a list of appraisers specified by the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the FDIC and the Office of Thrift Supervision under their respective real estate appraisal regulations adopted in accordance with Title XI of the Financial Institutions Reform Recovery and Enforcement Act of 1989,* regardless of whether the seller is subject to those regulations;
>
> • be experienced in the appraisal of properties similar to the type being appraised;
>
> • be actively engaged in appraisal work; and
>
> • subscribe to a code of ethics that is at least as strict as the code of the American Institute of Real Estate Appraisers or the Society of Real Estate Appraisers.

75.     The above statements of material fact were false and misleading when made because in truth, Impac: (i) abandoned its underwriting guidelines, verification procedures and quality control standards in order to increase loan originations; (ii) allowed pervasive exceptions to the company's underwriting guidelines in the absence of existing compensating factors; (iii) consistently failed to properly document prospective borrowers' ability to repay their mortgage loans; and (iv) systematically disregarded its stated appraisal standards and in many instances materially inflated the values of the underlying mortgaged properties in the loan origination and underwriting process.

**F.     Decision One Mortgage Abandoned Its Underwriting Guidelines**

76.     Decision One Mortgage ("Decision One"), a wholly-owned subsidiary of HSBC Group, emphasizes the origination of mortgage loans that are commonly referred to as Alt lending options, and non-conforming or sub-prime loans.  Decision One originated a substantial percentage of the loans for the CWALT 2006-OC2, CWALT 2006-OC4, CWALT 2006-OC6, and CWL 2007-BC3 RMBS purchased by Sealink.  The Offering Materials for such RMBS contained false and misleading statements of material fact regarding Decision One's underwriting standards and practices.  For example, the prospectus supplement for the CWALT 2006-OC4 RMBS described Decision One's underwriting guidelines, in relevant part, as follows:

> Mortgage loans originated or acquired by Decision One Mortgage, referred to in this section as the originator, were done so in accordance with the underwriting guidelines established by it (collectively, the "Decision One Underwriting Guidelines"). The following is a general summary of the Decision One Underwriting Guidelines believed to be generally applied, with some variation, by Decision One Mortgage.
>
> ***The Decision One Underwriting Guidelines are primarily intended to assess the borrower's ability to repay the mortgage loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the mortgage loan.*** All of the mortgage loans in the mortgage loan

pool were also underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market. While Decision One Mortgage's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, Decision One Mortgage also considers, among other things, a mortgagor's credit history, repayment ability and debt service to income ratio, as well as the type and use of the mortgaged property.

*The mortgage loans will have been originated in accordance with the Decision One Underwriting Guidelines. On a case by case basis, exceptions to the Decision One Underwriting Guidelines are made where compensating factors exist.*

Each applicant completes an application which includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information.

\*       \*       \*

The Decision One Underwriting Guidelines require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations and requires Decision One Mortgage's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal and a review of the appraisal, currently supports the outstanding loan balance.

77.     The Offering Materials also made false and misleading representations of material fact concerning Decision One's appraisal practices for mortgage loans backing the Certificates.

For example, the same prospectus supplement stated, in relevant part, that:

Mortgaged properties that are to secure mortgage loans are appraised by qualified independent appraisers. These appraisers inspect and appraise the subject property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market value analysis based on recent sales of comparable homes in the area, and when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. *All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac.*

~

78.    The above statements of material fact were false and misleading when made because in truth, Decision One: (i) abandoned its underwriting guidelines, verification procedures and quality control standards in order to increase loan originations; (ii) allowed pervasive exceptions to the company's underwriting guidelines in the absence of existing compensating factors; (iii) consistently failed to properly document prospective borrowers' ability to repay their mortgage loans; and (iv) systematically disregarded its stated appraisal standards and in many instances materially inflated the values of the underlying mortgaged properties in the loan origination and underwriting process.

### G.    Accredited Home Lenders, Inc. Abandoned Its Underwriting Guidelines

79.    Accredited Home Lenders, Inc. ("Accredited"), originated a substantial percentage of the MSHEL 2007-1 RMBS purchased by Sealink.  According to the MSHEL 2007-1 prospectus supplement, "Accredited focuses on originating mortgage loans which do not conform to credit and other criteria established by Fannie Mae and Freddie Mac, commonly referred to as "nonconforming" and "subprime" mortgage loans.  The Offering Materials for the RMBS contained false and misleading statements of material fact regarding Accredited's underwriting standards and practices.  For instance, the MSHEL 2007-1 prospectus supplements stated, in relevant part, as follows:

> Each mortgage loan originated or acquired by Accredited is underwritten prior to loan closing, or re-underwritten after loan closing but prior to purchase by Accredited, in accordance with Accredited's underwriting guidelines. *Accredited's underwriting process is intended to assess a mortgage loan applicant's credit standing and repayment ability and the value and adequacy of the real property security as collateral for the proposed mortgage loan.* All underwriting and re-underwriting is performed by Accredited's underwriting personnel, and Accredited does not delegate underwriting authority to any broker, correspondent or other mortgage loan provider. Accredited's underwriting standards

are applied in a standardized manner which complies with applicable federal and state laws and regulations.

*All of Accredited's prospective mortgage brokers and correspondents are subjected to a pre-approval process, including verification that all required licenses are current, and are required to sign agreements pursuant to which they represent and warrant compliance with Accredited's underwriting guidelines and all applicable laws and regulations.* Accredited periodically reviews each of its mortgage broker's and correspondent's performance relative to issues disclosed by Accredited's quality control review, and discontinues relationships with unacceptable performers.

*Each prospective mortgagor completes a mortgage loan application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information.* At least one credit report on each applicant from an independent, nationally recognized credit reporting company is required. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions, or judgments. All derogatory credit items occurring within the preceding two years and all credit inquiries within the preceding 90 days must be addressed by the applicant to the satisfaction of Accredited.

\*       \*       \*

*A critical function of Accredited's underwriting process is to identify the level of credit risk associated with each applicant for a mortgage loan. Accredited has established five principal classifications, "A+" to "C," with respect to the credit profile of potential borrowers, and a rating is assigned to each mortgage loan based upon these classifications.* Accredited has a sixth, generally inactive credit classification, called "C-" which may be assigned to a borrower with a current or recent foreclosure or bankruptcy and can still be used on an exception basis with approval from executive management. Accredited assigns credit grades by analyzing mortgage payment history, consumer credit history, credit score, bankruptcy history, and debt-to-income ratio.

*Each month, Accredited's internal audit and quality control department generally reviews and re-underwrites a sample of the mortgage loans originated by Accredited.* The statistical sample of mortgage loans is chosen by random selection and based on the prior defect rates. In addition, targeted reviews are conducted,

including but not limited to the following areas: regulatory compliance, targeted and discretionary reviews, or where misrepresentation is suspected. . . . All findings of the internal audit and quality control department are reported on a regular basis to members of senior management and the audit committee of the board of directors. The Chief Executive Officer and the Chief Operating Officer, along with the Director of Operations and others analyze the results of the monthly internal audit and quality control department audits as well as performance trends and servicing issues. Based upon this analysis, corrective actions are taken.

*Exceptions*. Accredited may allow exceptions to its underwriting guidelines in accordance with Accredited's established exception policy. ***Exceptions may be allowed based upon the presence of compensating factors such as a low LTV, demonstrated pride of ownership and stability of employment.***

80.    The Offering Materials also made false and misleading representations of material fact concerning Accredited's appraisal practices for mortgage loans backing the Certificates.  For example, the same prospectus supplement stated, in relevant part, that:

***A full appraisal of the property proposed to be pledged as collateral is required in connection with the origination of each first priority mortgage loan and each second priority mortgage loan greater than $50,000.*** Appraisals are performed by licensed, third-party, fee-based appraisers and include, among other things, an inspection of the exterior and interior of the subject property. Appraisals are also required to address neighborhood conditions, site and zoning status and the condition and value of improvements. Following each appraisal, the appraiser prepares a report which includes a reproduction costs analysis (when appropriate) based on the current cost of constructing a similar home and market value analysis based on recent sales of comparable homes in the area. ***Appraisals generally conform to the Uniform Standards of Professional Appraisal Practice and must be on forms acceptable to Freddie Mac and Fannie Mae.*** Every appraisal is reviewed by a non-affiliated appraisal review firm or by Accredited's Appraisal Review Department or a qualified underwriter before the mortgage loan is closed. The appraisal may not be more than 180 days old on the day the mortgage loan is funded. A second full appraisal is required for combined mortgage loan amounts greater than $1,000,000. For second priority mortgage loans of $50,000 or less, "drive-by" appraisals alone are acceptable.

81.   The above statements of material fact were false and misleading when made because in truth, Accredited: (i) abandoned its underwriting guidelines, verification procedures and quality control standards in order to increase loan originations; (ii) allowed pervasive exceptions to the company's underwriting guidelines in the absence of existing compensating factors; (iii) consistently failed to properly document prospective borrowers' ability to repay their mortgage loans; and (iv) systematically disregarded its stated appraisal standards and in many instances materially inflated the values of the underlying mortgaged properties in the loan origination and underwriting process.

## VI.   DEFENDANTS KNEW THE TRUTH ABOUT THE ORIGINATORS' LENDING PRACTICES

82.   Countrywide had identified (but never disclosed to investors like Sealink) the rampant underwriting deficiencies at the mortgage originators discussed above, which directly contradicted the representations in the Offering Materials accompanying the RMBS sold to Sealink. In particular, Countrywide was aware of the practices of its own mortgage originator Countrywide Home, as has been detailed in numerous private actions against those entities. Indeed, as alleged in a recently sustained claim brought on behalf of MBIA Insurance Corporation, Countrywide "developed a systematic pattern and practice of abandoning its own guidelines for loan origination and underwriting by knowingly lending to borrowers who could not afford to repay the loans, who committed fraud in loan applications, or who otherwise did not satisfy the basic risk criteria for prudent and responsible lending that Countrywide claimed to use."

83.   According to the Federal Crisis Inquiry Commission ("FCIC") "as early as September 2004 Countrywide executives recognized that many of the loans they were

originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm."

84.     Attorneys General from various states have investigated Countrywide's lending practices and charged that Countrywide systematically departed from the underwriting standards it professed to use for originating residential loans, including those loans originated by Countrywide Home.     For example, in 2008, the Illinois Attorney General investigated Countrywide's loan practices and filed an action in the Chancery Division of the Circuit Court of Cook County, Illinois, entitled *Illinois v. Countrywide Financial Corp., et al.*, No. 08CH22994 (the "Illinois AG Complaint").   The California Attorney General also investigated Countrywide's lending activities and filed a complaint in the Northwest District of the Superior Court for Los Angeles County, entitled *California v. Countrywide Financial Corp., et al.*, No. LC081846 (the "California AG Complaint").   Many of the allegations in the Illinois and California AG Complaints were confirmed by investigations in other states such as Connecticut, Washington, West Virginia, Indiana and Florida.     Significantly, on October 6, 2008, Countrywide announced that it had settled the claims brought by 11 states, including California and Illinois, agreeing to implement an estimated $8.4 billion program to modify pre-2008 Countrywide-originated mortgages.

85.     Lawsuits filed by insurers of some of Countrywide's mortgage loans have confirmed Countrywide's deviation from its stated underwriting practices, and material deficiencies prevalent in the loans underwritten pursuant to these deviations.  On September 30, 2008, MBIA filed a complaint against Countrywide in New York state court, entitled *MBIA Insurance Corp. v. Countrywide, et al.*, No. 08/602825.  The MBIA complaint alleges that Countrywide fraudulently induced MBIA to provide insurance for certain Certificates.  Through

~

an investigation of approximately 19,000 loan files, MBIA discovered that there was "an extraordinarily high incidence of material deviations from the underwriting guidelines Countrywide represented it would follow."   MBIA discovered that many of the loan applications "lack[ed] key documentation, such as a verification of borrower assets or income; include[d] an invalid or incomplete appraisal; demonstrate[d] fraud by the borrower on the face of the application; or reflect[ed] that any of borrower income, FICO score, or debt, or DTI [debt-to-income] or CLTV, fail[ed] to meet stated Countrywide guidelines (without any permissible exception)."   Significantly, "MBIA's re-underwriting review . . . revealed that almost 90% of defaulted or delinquent loans in the Countrywide Securitizations show material discrepancies."   The court sustained MBIA's common law fraud claims against Countrywide. *See MBIA Insurance Corporation v. Countrywide Home Loans, Inc.*, 2009 WL 2135167 (N.Y. Sup. July 8, 2009).   Other complaints filed by bond insurers Ambac Assurance Corporation (*Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, Index No. 641612/2010 (filed in the Supreme Court of the State of New York on May 6, 2010), Syncora Guarantee Incorporated (*Syncora Guarantee Inc. v. Countrywide Home Loans, Inc.*, Index No. 650042/09E (Amended Complaint filed in the Supreme Court of the State of New York on May 6, 2010 after the initial Complaint was largely sustained on March 31, 2010); and Mortgage Guaranty Insurance Corporation (arbitration) also reveal shocking fraud by Countrywide loan officers.

86.     According to Countrywide's own officers, level of exceptions for Countrywide originated mortgage loans was staggering.   For instance, at a June 28, 2005 Credit Risk Committee meeting, senior executives including CFO Sieracki and McMurray received a presentation informing the attendees that nonconforming exceptions loans accounted for a staggering 40% of Countrywide's loan originations.   By June 2006, a Credit Risk Leadership package reported that Countrywide underwrote, on an exceptions basis, 44.3% of its Pay-Option

ARMs, 37.3% of its subprime first liens, 25.3% of its subprime second liens, and 55.3% of its standalone home equity loans. Despite this high level of exceptions, Countrywide assured investors that the level of exceptions was low. According to Christopher Brendler, an analyst for Stifel Nicholas who covered Countrywide beginning in January 2006 and was deposed in the SEC Action, Countrywide repeatedly told investors during conference calls and at investor forums that the company's policy was to "keep our exceptions low." Brendler also testified that a low exception rate for the industry would have been 5% to 10% of total loans, and most certainly not upwards of 25% to 55%, such as Countrywide actually had.

87.    A June 28, 2005 Corporate Credit Risk Committee presentation revealed to senior executives that one-third of the loans rejected by Countrywide's own underwriting guidelines and approved pursuant to exceptions missed "major" underwriting guidelines, and another one-third missed "minor" underwriting guidelines. The presentation also informed the committee that exceptions-based loans greater than $650,000 were performing 2.8 times worse than similar loans underwritten within guidelines.

88.    Mozilo was acutely aware of the breakdown in Countrywide's procedures and the lack of compliance with Countrywide's underwriting guidelines. For example, in early 2006, HSBC exercised its contractual rights and forced Countrywide to "buy-back" many of the subprime 80-20 loans that it had purchased from Countrywide. Many of the HSBC "kick-outs" of defaulted loans were due to the fact that many of the underlying loans had been originated outside of Countrywide's underwriting guidelines. Following the HSBC incident, on April 13, 2006, Mozilo sent an e-mail to Sieracki and Sambol, stating that he had "personally observed a serious lack of compliance with our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]. In

my conversations with Sambol he calls the 100% subprime seconds as the 'milk' of the business. Frankly I consider that product line to be the poison of ours."

89.    At a March 12, 2007 Corporate Credit Risk Committee meeting, attended by Sambol, Risk Management reported that 12% of the loans reviewed through Countrywide's internal quality control process were rated severely unsatisfactory or high risk, and that one of the principal causes for such a rating was that loans had debt-to-income, loan to value, or FICO scores outside Countrywide's underwriting guidelines.

90.    On May 29, 2007, Sambol attended a Credit Risk Committee Meeting, during which he was informed that even as Countrywide had been purportedly tightening guidelines, "loans continue[d] to be originated outside guidelines" primarily via the Secondary Structured Lending Desk without "formal guidance or governance surrounding Secondary SID approvals." The presentation also included a recommendation from the credit management department that two divisions "cease to grant exceptions where no major competitor is offering the guideline."

91.    Countrywide's admission of its secret, rampant, and unjustified use of the exceptions process is further corroborated by the particularized allegations in a lawsuit by another financial guarantor—*Financial Guaranty Insurance Company v. Countrywide Home Loans, Inc.* The plaintiff in that lawsuit states that at two separate meetings between the parties at Countrywide's headquarters on April 24, 2007 and December 13, 2007, Countrywide admitted "that it had, apparently since sometime in 2006, undertaken a deliberate practice to routinely make increased exceptions to and expansion of its underwriting guidelines . . ." According to Countrywide, "[t]he reason . . . for these undisclosed exceptions and expansion of the guidelines was to try to retain [its] existing share of the mortgage origination market." Countrywide also informed Financial Guaranty Insurance Company that it had discovered borrower misrepresentation, speculation, and fraud at an increasing rate in 2006, which it

admitted "had been a significant factor in the underperformance of the 2006 securitized HELOC portfolios."

92.     In other recent lawsuits, Countrywide employees have confirmed the prevalence of these practices. One former Countrywide employee quoted in a class action complaint filed by Countrywide debt holders, *Argent Classic Convertible Arbitrage Fund v. Countrywide Financial Corp.*, stated that Countrywide routinely approved loans through the Exception Processing System that violated its underwriting guidelines.  And another former Countrywide employee, a former Assistant Vice President of Risk Management with Countrywide's Structured Loan Desk in Plano, Texas and an underwriter from 2004 until 2006 responsible for evaluating credit risk, stated that Countrywide's management "encouraged more and more loans" to be processed through the Exception Processing System beginning in 2004.  During 2006, Countrywide processed between 15,000 and 20,000 loans a month through the Exception Processing System.

93.     The complaint in a shareholder class action, *In re Countrywide Financial Corporation Securities Litigation* (C.D. Cal., Jan. 6, 2009), similarly alleges, based on statements from a loan underwriter in Countrywide's Consumer Markets Division, that "loan applications that should never have been approved were constantly kicked further up the corporate ladder until they reached a level where they would be approved by those driven solely by corporate profits and greed."

94.     The United States District Court denied Countrywide's motion to dismiss the federal scienter-based claims in the shareholder class action, holding that the allegations "present the extraordinary case where a company's essential operations were so at odds with the company's public statements that many statements that would not be actionable in the vast majority of cases are rendered cognizable to the securities laws."  The court explained that

descriptions like "'high quality' are generally not actionable; they are vague and subjective puffery not capable of being material as a matter of law." But here, the complaint "adequately alleges that Countrywide so departed from its public statements that even 'high quality' became materially false or misleading." Countrywide recently agreed to settle this lawsuit by paying $600 million.

95.     On information and belief, and based in part on Countrywide's knowledge of the abandoned underwriting practices at Countrywide Home and its status as one of the leaders in subprime origination, Defendants' knew that statements in the prospectus supplements concerning the originators underwriting guidelines were materially false and misleading. Defendants either knew or recklessly disregarded that a highly material number of the loans underlying their RMBS purchased by Sealink were not underwritten in compliance with the originator's guidelines.

## VII.    DEFENDANTS KNEW THE CREDIT RATINGS ASSIGNED TO THE DEFENDANTS' RMBS MATERIALLY MISREPRESENTED THE CREDIT RISK OF THE RMBS

96.     To bring its RMBS to market, Defendants knew that they needed to obtain the highest "investment grade" ratings possible from the credit rating agencies ("CRAs")— Moody's, S&P and Fitch—that rated Defendants' securitizations. Indeed, Defendants featured the ratings prominently in the Offering Materials and discussed at length the ratings received by the different tranches of the RMBS, and the bases for the ratings. The credit rating agencies received the information about the mortgage loan pools for each securitization and about the structure of the securitization from the sponsor, *i.e.*, Countrywide Home. Countrywide worked closely with the rating agencies to structure the securitizations to ensure that each tranche of RMBS received the desired rating. Yet, Countrywide knew that the ratings were not reliable because those ratings were supported by false information that Defendants provided.

~

97.    "Investment grade" products are understood in the marketplace to be stable, secure and safe.  Using S&P's scale, "investment grade" ratings are AAA, AA, A and BBB, and represent, high credit quality (AAA), upper-medium credit quality (AA and A) and medium credit quality (BBB).  Any instrument rated below BBB is considered below investment grade or "junk bond."

98.    The Offering Materials for the Defendants' RMBS Sealink purchased state that the issuance of each tranche of the RMBS was conditioned on the assignment of particular investment-grade ratings, and listed the ratings in a chart.   All of the tranches of RMBS purchased by Sealink were rated triple-A.  The triple-A rating denotes "high credit-quality," and is the same rating as those typically assigned to bonds backed by the full faith and credit of the United States Government, such as Treasury Bills.  For example, Bear Stearns represented in the CWL 2006-18 prospectus supplement that:

> It is a condition of the issuance of the Offered Certificates that each class of Offered Certificates set forth below be assigned the ratings at least as high as those designated below by Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P") and together with Moody's, the "Rating Agencies").

| Class | Moody's Rating | S&P Rating |
|-------|----------------|------------|
| 1-A   | Aaa            | AAA        |
| 2-A-1 | Aaa            | AAA        |
| 2-A-2 | Aaa            | AAA        |
| 2-A-3 | Aaa            | AAA        |
| A-R   | Aaa            | AAA        |
| M-1   | Aa1            | AA+        |
| M-2   | Aa2            | AA         |
| M-3   | Aa3            | AA-        |
| M-4   | A1             | A+         |
| M-5   | A2             | A          |
| M-6   | A3             | A-         |
| M-7   | Baa1           | BBB+       |
| M-8   | Baa2           | BBB        |

~

| M-9 | Baa3 | BBB- |

\*     \*     \*

> The security ratings assigned to the Offered Certificates should be evaluated independently from similar ratings on other types of securities. A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the Rating Agencies. The ratings on the Offered Certificates do not, however, constitute statements regarding the likelihood or frequency of prepayments on the Mortgage Loans, the payment of Net Rate Carryover or the anticipated yields in light of prepayments.

99.     The above statements (and the substantially similar statements appearing in all of the Defendants' RMBS Offering Materials) regarding the ratings assigned to the Defendants' RMBS, as well as the ratings themselves, were materially false and misleading because Defendants touted these ratings while knowing that those ratings were based on the misleading information Defendants provided to the CRAs.

100.    The credit ratings of the RMBS were further compromised by misinformation provided by Defendants regarding the abandonment of the originators' underwriting standards, rampant use of aggressive exceptions, Defendants' knowledge or reckless disregard of pervasive fraud in the stated income loan programs, and the inflated appraisals assigned to the underlying collateral, as described above. The Defendants knew that the AAA ratings assigned to the RMBS were false because the originators did not follow their own underwriting standards and, as such, no reliable estimate could be made concerning the level of enhancement necessary to ensure that the top tranches purchased by Sealink were of AAA quality. By including and endorsing these AAA ratings in the Offering Materials, Defendants made a false representation that it actually believed that the AAA ratings were an accurate reflection of the credit quality of the RMBS.

101.   Subsequent downgrades confirm that the investment grade ratings reported in the Offering Materials were unjustifiably high and misstated the true credit risk of the RMBS purchased by Sealink.   The RMBS purchased by Sealink—all of which were each initially awarded a triple-A rating—have almost without exception been downgraded to junk.   The *en masse* downgrade of AAA-rated RMBS indicates that the ratings set forth in the Offering Materials were false, unreliable and inflated.

VIII.   **DEFENDANTS' FALSE AND MISLEADING MISSTATEMENTS AND OMISSIONS OF MATERIAL FACT IN THE OFFERING DOCUMENTS**

102.   The Offering Materials Sealink relied upon in purchasing the Defendants' RMBS contained numerous misrepresentations of material fact, or omitted to state material fact necessary to make the statements therein not misleading, regarding: (i) the originators' underwriting practices and guidelines by which the loans were originated, including the prevalence and type of exceptions to those guidelines being applied to the underlying loans, and the rampant fraud in stated income loans; (ii) the value of the underlying property securing the loans, in terms of LTV and CLTV ratios and the appraisal standards by which such mortgaged properties were measured; (iii) the due diligence that Defendants conducted into the mortgage loans backing the RMBS, which identified pervasive defects in the loans underlying the securitizations; (iv) the credit ratings assigned to the RMBS; and (v) the true risks of the RMBS.

A.   **The Offering Materials Misrepresented The Originators' Underwriting Guidelines.**

103.   The originators discussed above originated the mortgage loans that backed the RMBS purchased by Sealink.   The Offering Materials for the RMBS all contained identical or materially similar statements of material fact regarding the originators' underwriting guidelines and practices.   For example, the prospectus supplement for the CWALT 2006-45T1 RMBS described Countrywide Home's underwriting guidelines, in relevant part, as follows:

All of the mortgage loans in the issuing entity will have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting process. Countrywide Home Loans has been originating mortgage loans since 1969. ***Countrywide Home Loans' underwriting process are applied in accordance with applicable federal and state laws and regulations.*** Except as otherwise provided in this prospectus supplement, the underwriting procedures are consistent with those identified under "Loan Program — Underwriting Standards" in the prospectus.

*    *    *

***Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.*** Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits. . . . ***Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.***

104.    The above statements of material fact and similar statements regarding the originators whose loans back the Defendants' RMBS in which Sealink invested, were materially false and misleading when made because, as explained above, they misrepresented the true facts, known by Defendants, that the originators: (i) systematically and flagrantly failed to follow their stated underwriting guidelines; (ii) allowed pervasive exceptions to their underwriting standards regardless of existing compensating factors; (iii) disregarded credit quality to fuel loan originations to sell to loan purchasers such as Defendants; and (iv) routinely allowed fraudulent representations of an applicant's stated income, failed to verify a prospective borrowers documentation or statements regarding income or assets, and, in many cases, knowingly falsified the borrower's stated or documented income or assets.

50

## B. The Offering Materials Misrepresented The Appraisals And LTV Ratios Of The Securitized Loans

105.    The adequacy of the mortgaged properties as security of the repayment of the loans was purportedly determined by appraisals.   The Offering Materials represented that independent appraisals were prepared for each mortgaged property and that reports were prepared to substantiate these appraisals.   For example, the AHMA 2007-2 prospectus supplement described American Home's appraisal practices as follows:

> *Every American Home mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation.* The appraisers perform on site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties, a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment. In addition, each appraisal is reviewed for accuracy and consistency by an American Home underwriter or a mortgage insurance company contract underwriter.

106.    As discussed above, the representations regarding appraisals and LTV ratios were materially false and misleading in that they misrepresented that the appraisal process employed by the originators, including, among others things, the fact that: (i) the appraisers were not independent from the respective mortgage lenders, which pressured appraisers to value the mortgaged property at a pre-determined, preconceived, inflated, and false appraisal value; (ii) the actual LTV ratios for many of the mortgage loans underlying the RMBS would have exceeded 100% if the mortgaged properties had been appraised by an independent appraiser as represented in the Offering Documents; (iii) sales managers employed by the respective originators had and utilized the authority to override and inflate an appraiser's final professional valuation of the

mortgaged property; and, as such, (iv) the appraisals failed to conform to the standards set by Fannie Mae and Freddie Mac.

### C.    Defendants Materially Misrepresented The Accuracy Of The Credit Ratings Assigned To The Certificates

107.    Defendants represented in the Offering Materials that all of the RMBS purchased by Sealink were worthy of being rated "AAA," signifying that the risk of loss was virtually non-existent.

108.    By providing ratings, Defendants represented that they believed that the information provided to the rating agencies to support these ratings accurately reflected the Defendants' underwriting guidelines and practices, and the specific qualities of the underlying loans.   Specifically, the Offering Materials prepared by Defendants represented, in sum or substance, that:

> It is a condition of the issuance of the Offered Certificates that each class of Offered Certificates set forth below be assigned the ratings at least as high as those designated below by Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P") and together with Moody's, the "Rating Agencies").

| Class | Moody's Rating | S&P Rating |
|-------|----------------|------------|
| 1-A   | Aaa            | AAA        |
| 2-A-1 | Aaa            | AAA        |
| 2-A-2 | Aaa            | AAA        |
| 2-A-3 | Aaa            | AAA        |
| A-R   | Aaa            | AAA        |
| M-1   | Aa1            | AA+        |
| M-2   | Aa2            | AA         |
| M-3   | Aa3            | AA-        |
| M-4   | A1             | A+         |
| M-5   | A2             | A          |
| M-6   | A3             | A-         |
| M-7   | Baa1           | BBB+       |
| M-8   | Baa2           | BBB        |
| M-9   | Baa3           | BBB-       |

\*       \*       \*

> The security ratings assigned to the Offered Certificates should be evaluated independently from similar ratings on other types of securities. A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the Rating Agencies. The ratings on the Offered Certificates do not, however, constitute statements regarding the likelihood or frequency of prepayments on the Mortgage Loans, the payment of Net Rate Carryover or the anticipated yields in light of prepayments.

109.   These statements regarding the ratings assigned to the RMBS were false and misleading because Defendants stated the assigned ratings while knowing that misleading information was provided to the rating agencies by Defendants to guarantee AAA ratings were assigned to the RMBS.

## IX.   SEALINK'S INVESTMENT IN THE RMBS AND RELIANCE ON DEFENDANTS' MISREPRESENTATIONS

110.   The RMBS for all offerings were issued pursuant to the Offering Materials, which contained the false and misleading statements set forth above.  These documents also generally explained the structure and provided an overview of the RMBS.   The relevant depositor prepared the Offering Materials.

111.   The Offering Materials contained detailed descriptions of the mortgage pools underlying the RMBS and provided the specific terms of the particular RMBS offering.  The Offering Materials included tabular data concerning the loans underlying the RMBS, including (but not limited to) the type of loans; the number of loans; the mortgage rate and net mortgage rate (the mortgage rate net of the premium for any lender paid mortgage insurance less the sum of the master servicing fee and the trustee fee on the mortgage loan); the aggregate scheduled principal balance of the loans; the weighted average original combined LTV ratio; occupancy rates; credit enhancement; and the geographic concentration of the mortgaged properties.  The

~

Offering Materials also contained a summary of the originators' underwriting and appraisal standards, guidelines and practices.

112.    In deciding to purchase the RMBS, Sealink relied on the Defendants' false representations and omissions of material fact regarding their underwriting standards and the characteristics of the mortgage loans underlying the RMBS in the Offering Materials.  But for the Defendants' fraudulent representations and omissions, Sealink would not have purchased the RMBS.

113.    Sealink reasonably relied upon the Countrywide's representations in the Offering Materials regarding the underlying loan quality.  Sealink did not know at the time it purchased the RMBS, and could not have known, that the originators were not following their underwriting guidelines, leading to a drastic increase in the origination of risky loans, nor did Sealink know that the property appraisals secured by the originators were not independent and resulted in false appraisal values.  Sealink also did not know that the originators knowingly or recklessly accepted false information about material fact such as borrowers' stated income, which caused the Defendants' representations to be false.  Sealink did not know that Defendants' due diligence had identified significant problems with the originators' loans signifying that a substantial number of the loans underlying the RMBS would not be able to be repaid.  If Sealink had known these and other material facts regarding Defendants' fraudulent misrepresentations and omissions of material fact contained in the Offering Materials, Sealink would not have purchased the RMBS.

114.    Defendants' misrepresentations and omissions of material fact caused Sealink to suffer losses on the RMBS, because the RMBS were far riskier—and their rate of default far higher—than the Offering Materials represented them to be.  The mortgage loans underlying the

RMBS experienced defaults and delinquencies at a much higher rate due to the originators' abandonment of their loan-origination guidelines.

115.    Sealink purchased each RMBS in reliance on the information contained in the applicable Offering Materials.  In connection with the offers and sales of the RMBS to Sealink, Defendants provided directly or indirectly to Sealink's investment advisors the Offering Materials.  Similar information was sent to and analyzed by Sealink's investment advisors if the RMBS was sold to them in the secondary market.

116.    Sealink reviewed and analyzed the Offering Materials provided directly or indirectly by Defendants with respect to each offering of RMBS and performed various analyses of the RMBS-specific data for each offering before deciding to purchase RMBS in the offering.  The analyses conducted by Sealink before deciding to purchase a RMBS included various credit analyses based on the information provided by Defendants with respect to both the credit characteristics of the mortgage loan pool (including, for example, geographic concentration; weighted average life; fixed- or floating-rate loans; full-, low-, or no-documentation "stated income" loans; and owner-occupied, second home, or investment properties), and the structure of the securitization with respect to the seniority and risk characteristics of the particular tranche of RMBS (including, for example, position in the payment "waterfall").

117.    Thus, Sealink justifiably relied on the Offering Materials provided directly or indirectly by Defendants for each offering of the RMBS.  These documents contained numerous statements of material fact about the RMBS, including statements concerning: (i) the mortgage originators' underwriting guidelines that were purportedly applied to evaluate the ability of the borrowers to repay the loans underlying the RMBS; (ii) the appraisal guidelines that were purportedly applied to evaluate the value and adequacy of the mortgaged properties as

collateral; (iii) the LTV ratios and debt to income ratios; (iv) Defendants' due diligence of the loans and the originators' underwriting practices; and (v) the ratings assigned to the RMBS.

118.    These statements of material fact were untrue because: (i) the originators violated their stated underwriting guidelines and did not originate loans based on the borrowers' ability to repay; and (ii) inflated appraisals caused the listed LTV ratios and levels of credit enhancement to be untrue.  In addition, metrics such as debt-to-income ratios were untrue as a result of the other mortgage originators' acceptance of untrue information from mortgage applicants.  For example, Defendants and the mortgage originators allowed applicants for "stated income" loans to provide untrue income information and did not verify the applicants' purported income.  In addition, the credit ratings on which Sealink relied were materially misleading, did not reflect the true credit quality of the RMBS and were the result of intentional manipulation.

## X.    BECAUSE OF DEFENDANTS' FRAUDULENT CONDUCT, SEALINK SUFFERED LOSSES ON ITS PURCHASES OF RMBS

119.    The ratings on virtually all of the RMBS have since been downgraded and they are no longer marketable or salable at the prices paid for them by Sealink.  All of the RMBS in which Sealink purchased interests were rated "AAA" at issuance and the vast majority have since been downgraded to junk.

120.    Further, the delinquency, bank ownership and foreclosure rates on the underlying mortgages have soared since issuance.  These current performance numbers do not reflect the number of loans which have been foreclosed since issuance and which are no longer included within the loan pools.  A substantial number of the original loans contained in the loan pools have been removed from the pools, largely due to either foreclosure or early payout, negatively impacting the income payable to certificate-holders.

## XI.   AS COUNTRYWIDE'S SUCCESSOR, BANK OF AMERICA IS VICARIOUSLY LIABLE FOR COUNTRYWIDE'S ACTIONS

121.   As Countrywide's successor in liability, Bank of America is jointly and severally liable for any and all damages resulting to Plaintiffs from the wrongful actions of Countrywide. Bank of America itself has acknowledged that its acquisition of all of Countrywide's assets through an all-stock transaction on July 1, 2008 was a "merger."  In a July 2008 press release, Barbara Desoer, identified as the head of the "combined mortgage, home equity and insurance businesses" of Bank of America and Countrywide, said: "Now we begin to combine the two companies and prepare to introduce our new name and way of operating."  According to Bank of America, it "anticipates substantial cost savings from combining the two companies," from eliminating employment positions, and from reducing overlapping technology, vendor and marketing expenses.  Desoer added that "the company is expected to benefit by leveraging its broad product set to deepen relationships with existing Countrywide customers."  Desoer was also interviewed for the May 2009 issue of *Housing Wire*, which reported that one of the assets [Bank of America] acquired with Countrywide was a vast technology platform for originating and servicing loans, and Desoer says that the bank will be migrating some aspects of BofA's mortgage operations over to Countrywide's platforms. Desoer was quoted as saying, "[w]e're done with defining the target, and we're in the middle of doing the development work to prepare us to be able to do the conversion of the part of the portfolio going to the legacy Countrywide platforms." Mozilo stated in another press release that "the combination of Countrywide and Bank of America will create one of the most powerful mortgage franchises in the world."  And in its 2008 Annual Report, Bank of America confirmed that by acquiring Countrywide it became the "No. 1 provider of both mortgage originations and servicing" and "as a combined

company," it would be recognized as a "responsible lender who is committed to helping our customers become successful homeowners."

122.   Bank of America has reported to the SEC that on November 7, 2008, Countrywide Financial and Countrywide Home "transferred substantially all of their assets and operations to [Bank of America]."   This transfer of assets was "in connection with the integration of Countrywide Financial Corporation with [Bank of America's] other businesses and operations."   A California federal court recently found that since the merger, "Countrywide's remaining operations and employees have been transferred to Bank of America, and Bank of America ceased using the Countrywide name in April 2009."   And the New York Supreme Court has denied the defendants' motion to dismiss MBIA's and Syncora's – both monoline bond insurers – successor and vicarious liability claims against Bank of America based on Countrywide MBS.  Countrywide also ceased submitting filings to the SEC, which are now submitted as part of Bank of America's filings. Further, Bank of America has taken responsibility for Countrywide's pre-merger liabilities, including restructuring hundreds of thousands of loans created and serviced by Countrywide and paying billions of dollars in settlements.

123.   A spokesperson for Bank of America confirmed: "We bought the company and all of its assets and liabilities."  Similarly, a January 23, 2009 *New York Times* article quoted Kenneth D. Lewis (who at the time was Bank of America's Chairman and CEO), acknowledging that Bank of America had factored Countrywide's liabilities into the price it paid to acquire Countrywide: "We looked at every aspect of the deal, from their assets to potential lawsuits and we think we have a price that is a good price."

124.   Consistent with its assumption of Countrywide's liabilities, on October 6, 2008, Bank of America settled lawsuits brought against Countrywide by state Attorneys General by

agreeing to loan modifications for 390,000 borrowers, an agreement valued up to $8.4 billion. Bank of America also agreed to pay $150 million to help Countrywide customers who were already in or were at serious risk of foreclosure, and an additional $70 million to help Countrywide customers who had already lost their homes to make the transition to other living arrangements. In 2008, Bank of America restructured 300,000 home loans of which 87% had been originated or serviced by Countrywide. In announcing that its loan modification program, known as the National Homeowners Retention Program ("NHRP"), will now have a "principal forgiveness" component, Bank of America noted that it "developed and launched the NHRP to provide assistance to Countrywide borrowers."

125.    On January 3, 2011, Bank of America paid $2.8 billion to GSEs Freddie Mac and Fannie Mae to settle claims of misrepresentations on billions of dollars in loans that went sour after Fannie and Freddie bought them from Countrywide.  In exchange for the payments, Freddie Mac and Fannie Mae agreed to drop their demands that Bank of America buy back the mortgages.  The payment of $1.28 billion to Freddie Mac settled 787,000 loan claims (current and future) sold by Countrywide through 2008.  The payment of $1.34 billion (after applying credits to an agreed upon settlement amount of $1.52 billion) to Fannie Mae settled repurchase claims on 12,045 Countrywide loans (with approximately $2.7 billion of unpaid principal balance) and other specific claims on 5,760 Countrywide loans (nearly $1.3 billion of unpaid principal balance).

126.    Upon information and belief, Bank of America has been operating Countrywide Home effectively as a division of Bank of America. To that end, on April 27, 2009, Bank of America announced that "[t]he Countrywide brand has been retired." Bank of America advised that it is operating the Countrywide home loan and mortgage business as a "division" named Bank of America Home Loans, which "represents the combined operations of Bank of

~

America's mortgage and home equity business and Countrywide Home Loans." The Bank of America Home Loans division is headquartered at Countrywide's offices in Calabasas, California.

127.    Further, Bank of America's website states that "Countrywide customers ... have access to Bank of America's 6,100 banking centers." Countrywide's former website redirects customers to Bank of America's website.

## XII.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### (Common Law Fraud Against Countrywide Financial, Countrywide Home Loans, Countrywide Securities, And The Depositor Defendants)

128.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, as if fully set forth herein.

129.    As alleged above, in the Offering Documents and in their public statements, Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants made fraudulent and false statements of material fact, and omitted material facts necessary in order to make their statements, in light of the circumstances under which the statements were made, not misleading.

130.    As a corporate parent, Countrywide Financial directed the activities of Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants.

131.    Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants knew at the time they sold and marketed each of the Certificates that the foregoing statements were false or, at the very least, made recklessly, without any belief in the truth of the statements.

132.    Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants made these materially misleading statements and omissions for the purpose of inducing Plaintiffs to purchase the Certificates.   Furthermore, these statements related to these Defendants' own acts and omissions.

133.    Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants knew that Plaintiffs were relying on their expertise, and they encouraged such reliance through the Offering Documents, private placement memoranda, and their public representations, as described herein.  Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants knew that Plaintiffs would rely upon their representations in connection with Plaintiffs' decision to purchase the Certificates. Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants were in a position of unique and superior knowledge regarding the true facts concerning the foregoing material misrepresentations and omissions.

134.    It was only by making such representations that Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants were able to induce Plaintiffs to buy the Certificates. Plaintiffs would not have purchased or otherwise acquired the Certificates but for Countrywide Financial's, Countrywide Home Loans', Countrywide Securities', and the Depositor Defendants' fraudulent representations and omissions about the quality of the Certificates.

135.    Plaintiffs justifiably, reasonably, and foreseeably relied on Countrywide Financial's, Countrywide Home Loans', Countrywide Securities', and the Depositor Defendants' representations and false statements regarding the quality of the Certificates.

136.    As a result of the false and misleading statements and omissions, as alleged herein, Plaintiffs have suffered substantial damages.

137.   Because Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants committed these acts and omissions maliciously, wantonly and oppressively, and because the consequences of these acts knowingly affected the general public, including but not limited to all persons with interests in the Certificates, Plaintiffs are entitled to recover punitive damages.

## SECOND CAUSE OF ACTION

### (Fraudulent Inducement Against Countrywide Financial, Countrywide Home Loans, Countrywide Securities, And The Depositor Defendants)

138.   Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, as if fully set forth herein.

139.   As alleged above, in the Offering Documents and in their public statements, Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants made fraudulent and false statements of material fact, and omitted material facts necessary in order to make their statements, in light of the circumstances under which the statements were made, not misleading.

140.   This is a claim for fraudulent inducement against Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants.   As a corporate parent, Countrywide Financial directed the activities of Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants.

141.   Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants knew at the time they sold and marketed each of the Certificates that the foregoing statements were false or, at the very least, made recklessly, without any belief in the truth of the statements.

142.   Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants made these materially misleading statements and omissions for the purpose of inducing Plaintiffs to purchase the Certificates.   Furthermore, these statements related to these Defendants' own acts and omissions.

143.   Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants knew that Plaintiffs were relying on their expertise, and they encouraged such reliance through the Offering Documents and their public representations, as described herein. Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants knew that Plaintiffs would rely upon their representations in connection with Plaintiffs' decision to purchase the Certificates.   Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants were in a position of unique and superior knowledge regarding the true facts concerning the foregoing material misrepresentations and omissions.

144.   It was only by making such representations that Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants were able to induce Plaintiffs to buy the Certificates. Plaintiffs would not have purchased or otherwise acquired the Certificates but for Countrywide Financial's, Countrywide Home Loans', Countrywide Securities', and the Depositor Defendants' fraudulent representations and omissions about the quality of the Certificates.

145.   Plaintiffs justifiably, reasonably, and foreseeably relied on Countrywide Financial's, Countrywide Home Loans', Countrywide Securities', and the Depositor Defendants' representations and false statements regarding the quality of the Certificates.

146.   By virtue of Countrywide Financial's, Countrywide Home Loans', Countrywide Securities', and the Depositor Defendants' false and misleading statements and omissions, as

alleged herein, Plaintiffs have suffered substantial damages and are also entitled to a rescission of the sale of the Certificates.

### THIRD CAUSE OF ACTION

**(Aiding And Abetting Fraud Against Countrywide Financial, Countrywide Home Loans, Countrywide Securities, The Depositor Defendants, Mozilo And Sambol)**

147.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, as if fully set forth herein.

148.    This is a claim against the above-named aiding and abetting Countrywide Defendants for aiding and abetting the fraud by Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants. Each of these Defendants aided and abetted the fraud committed by all of the others among these Defendants.

149.    The above-named aiding and abetting Countrywide Defendants knew of the fraud perpetrated by Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants on Plaintiffs. As alleged in detail above, each of the above-named aiding and abetting Countrywide Defendants knew that the Certificates were not backed by high quality loans and were not underwritten according to Countrywide Home Loans' underwriting standards, received internal reports about the violations of Countrywide Home Loan' mortgage loan underwriting and appraisal standards, participated in those violations and had actual knowledge of their own acts, or participated in and had actual knowledge of Defendants' failure to convey good title to the mortgage loans underlying the Certificates to the issuing trusts.

150.    Furthermore, the above-named aiding and abetting Countrywide Defendants provided Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants with substantial assistance in advancing the commission of the fraud. As alleged in detail above, each of the above-named aiding and abetting Countrywide Defendants

participated in the violations of Countrywide Home Loans' mortgage loan underwriting and appraisal standards, made false public statements about Countrywide Home Loans' mortgage loan underwriting and appraisal standards, provided false information about the mortgage loans underlying the Certificates to the credit rating agencies, provided false information for use in the Offering Documents, or participated in the failure to properly endorse and deliver the mortgage notes and security documents to the issuing trusts.

151.   It was foreseeable to the above-named aiding and abetting Countrywide Defendants at the time they actively assisted in the commission of the fraud that Plaintiffs would be harmed as a result of their assistance.

152.   As a direct and natural result of the fraud committed by Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositor Defendants and the above-named aiding and abetting Countrywide Defendants' knowing and active participation therein, Plaintiffs have suffered substantial damages.

## FOURTH CAUSE OF ACTION

### (Negligent Misrepresentation Against Mozilo, Sambol, Countrywide Financial, Countrywide Securities, and Countrywide Home Loans)

153.   Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein, except any allegations that the Countrywide Defendants made any untrue statements and omissions intentionally or recklessly. For the purposes of this Count, Plaintiff expressly disclaims any claim of fraud or intentional misconduct.

154.   This is a claim for negligent misrepresentation against Mozilo, Sambol, Countrywide Financial Corp., Countrywide Securities Corporation, and Countrywide Home Loans, (the "Negligent Misrepresentation Defendants").

155.   Sealink made 31 separate investments in 30 Offerings of RMBS that the Defendants securitized and sold.   The Negligent Misrepresentation Defendants originated, acquired, or underwrote all the loans in the Offerings.   Mozilo and Sambol were closely involved in the everyday management of the other Negligent Misrepresentation Defendants.

156.   Because the Negligent Misrepresentation Defendants arranged the Securitizations, and originated, acquired, or underwrote all of the underlying mortgage loans, they had unique and special knowledge about the loans in the Offerings.   In particular, the Negligent Misrepresentation Defendants had unique and special knowledge and expertise regarding the quality of the underwriting of those loans.

157.   In particular, because Sealink neither had information regarding the lenders for loans originated or acquired by Countrywide Home Loans nor had access to the loan files for the mortgage loans underlying the Countrywide RMBS, and because Sealink could not examine the underwriting quality of the mortgage loans in the securitizations on a loan-by-loan basis, it was heavily dependent on the Defendants' unique and special knowledge regarding the Countrywide Home Loans loans that backed the RMBS at issue when determining whether to invest in each RMBS. Sealink was entirely dependent on the Defendants to provide accurate information regarding the loans in engaging in that analysis. Accordingly, the Defendants were uniquely situated to evaluate the economics of each RMBS.

158.   Over the course of more than two years, for over 30 separate investments, Sealink relied on the Negligent Misrepresentation Defendants' unique and special knowledge regarding the quality of the underlying mortgage loans and their underwriting when determining whether to invest in the Offerings. This longstanding relationship, coupled with the Negligent Misrepresentation Defendants' unique and special knowledge about the underlying loans,

created a special relationship of trust, confidence, and dependence between the Negligent Misrepresentation Defendants and Plaintiffs.

159.    The Negligent Misrepresentation Defendants were aware that Plaintiffs relied on their unique and special expertise and experience and depended upon them for accurate and truthful information.   The Negligent Misrepresentation Defendants also knew that the facts regarding Countrywide's compliance with its underwriting standards were exclusively within their knowledge.

160.    Based on their expertise, superior knowledge, and relationship with Plaintiffs, the Negligent Misrepresentation Defendants owed a duty to Plaintiffs to provide complete, accurate, and timely information regarding the mortgage loans and the RMBS.   The Negligent Misrepresentation Defendants breached their duty to provide such information to Plaintiffs.

161.    The Negligent Misrepresentation Defendants likewise made misrepresentations which they knew, or were negligent in not knowing at the time to be false, in order to induce Plaintiffs' investment in the RMBS.   The Negligent Misrepresentation Defendants provided the Offering Documents to Plaintiffs in connection with the RMBS, for the purpose of informing Plaintiffs of material facts necessary to make an informed judgment about whether to purchase the RMBS in the Offerings.   In providing these documents, Countrywide knew that the information contained and incorporated therein would be used for a serious purpose, and that Plaintiffs, like other reasonably prudent investors, intended to rely on the information.

162.    As alleged above, the Offering Documents contained materially false and misleading information.

163.    The Negligent Misrepresentation Defendants should have known that the information in the Offering Documents was materially false and misleading.

~

164.    Unaware that the Offering Documents contained materially false and misleading statements, Plaintiffs reasonably relied on those false and misleading statements when deciding to purchase the non-secondary Certificates in the Offerings.

165.    Sealink purchased RMBS from the Depositor Defendants and from Countrywide Securities, and are therefore in privity with Countrywide Securities and the Depositor Defendants.

166.    Based on the Negligent Misrepresentation Defendants' expertise and specialized knowledge, and in light of the false and misleading representations in the Offering Documents, the Negligent Misrepresentation Defendants owed Sealink a duty to provide them with complete, accurate, and timely information regarding the quality of the RMBS, and breached their duty to provide such information to Plaintiffs.

167.    Sealink reasonably relied on the information provided by the Negligent Misrepresentation Defendants and have suffered substantial damages as a result of their misrepresentations.

## FIFTH CAUSE OF ACTION

### (Successor And Vicarious Liability Against The Bank Of America Defendants)

168.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, as if fully set forth herein.

169.    The Bank of America Defendants – BAC Home Loans Servicing, and NB Holdings – are jointly and severally liable for any and all damages resulting from the wrongful actions of Countrywide Financial, Countrywide Home Loans, and Countrywide Securities, as alleged herein, because it is the successor-in-interest to Countrywide Financial and is vicariously liable for the conduct of Countrywide Financial, Countrywide Home Loans, and Countrywide Securities as a result of a de facto merger of the two entities.

~

170.    This acquisition was a de facto merger because Bank of America intended to take over and effectively took over Countrywide Financial and its subsidiaries in their entirety and, thus, should carry the liabilities of Countrywide Financial, Countrywide Home Loans, and Countrywide Securities, as a concomitant to the benefits it derived from the purchase.

171.    The acquisition resulted in continuity of ownership – a hallmark of a de facto merger – because the shareholders of Countrywide Financial became shareholders of Bank of America as a result of Bank of America's acquisition of Countrywide Financial on July 1, 2008 through an all-stock transaction involving a wholly-owned Bank of America subsidiary that was created for the sole purpose of facilitating the acquisition of Countrywide Financial. Bank of America has described the transaction as a merger, and has actively incorporated the Countrywide's mortgage business into Bank of America.

172.    Bank of America assumed the liabilities ordinarily necessary for the uninterrupted continuation of the business of Countrywide Financial, Countrywide Home Loans, and Countrywide Securities – another hallmark of a de facto merger. Among other things, the Countrywide brand has been retired and the old Countrywide website redirects customers to the mortgage and home loan sections of Bank of America's website. On April 27, 2009, Bank of America announced that "[t]he Countrywide brand has been retired." Instead, Bank of America operated its home loan and mortgage business through a new division named Bank of America Home Loans, which "represents the combined operations of Bank of America's mortgage and home equity business and Countrywide Home Loans." The integration of Countrywide Financial, Countrywide Home Loans, and Countrywide Securities into Bank of America is complete.

173.    The ordinary business of Countrywide Financial was ceased and the Company dissolved soon after the acquisition – another hallmark of a de facto merger. On November 7,

2008, Bank of America acquired substantially all of the assets of Countrywide Financial. And, at that time, Countrywide Financial ceased submitting filings to the SEC; Countrywide Financial's assets and liabilities are now included in Bank of America's filings.

174.    Bank of America has also taken responsibility for the pre-merger liabilities of Countrywide Financial, Countrywide Home Loans, and Countrywide Securities, including restructuring hundreds of thousands of loans created and serviced by these Defendants. As a spokesperson for Bank of America admitted: "We bought the company and all of its assets and liabilities."

175.    Because Bank of America has merged with Countrywide Financial, and acquired substantially all of the assets of Countrywide Home Loans, and Countrywide Securities, through BAC Home Loans Servicing, NB Holdings and others, the Bank of America Defendants are the successors in liability to Countrywide Financial, Countrywide Home Loans, and Countrywide Securities, and are jointly and severally or otherwise vicariously liable for the wrongful conduct, as alleged herein, of these Defendants.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

(a)    Awarding compensatory and/or rescissionary damages in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(b)    Awarding punitive damages for Plaintiffs' common-law fraud claims;

(c)    Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other relief as the Court may deem just and proper.

~

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

Dated: New York, New York
      September 29, 2011

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

/s/ Gerald H Silk
Gerald H. Silk
Avi Josefson
Michael D. Blatchley
Ross Shikowitz
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444
jerry@blbglaw.com
avi@blbglaw.com
michaelb@blbglaw.com
ross@blbglaw.com

*Counsel for Plaintiff*